# WILLIAM IRA SAUNDERS

## V.

# COMMONWEALTH OF VIRGINIA

Record No. 901488

June 7, 1991

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Hassell, JJ., and Poff, Senior Justice

*Edward M. Stowe (William H. Smith; Smith & Stowe,* on brief), for appellant.

*Robert H. Anderson, III, Assistant Attorney General (Mary Sue Terry, Attorney General; Oliver L. Norrell, III, Assistant Attorney General*, on brief), for appellee.

SENIOR JUSTICE POFF delivered the opinion of the Court.

In this appeal, we review a capital murder conviction and a judgment imposing a death penalty upon William Ira Saunders.

## I. PROCEEDINGS

Upon his motion, the Commonwealth and the court concurring, Saunders was tried by the court without a jury upon indictments charging capital murder, robbery, and use of a firearm in the commission of capital murder. Invoking the grounds defined in Code § 18.2-31(4), the capital murder indictment charged that the murder was accomplished "in the commission of robbery, while armed with a deadly weapon".

At the first stage of a bifurcated trial conducted pursuant to Code § 19.2-264.4(A), Saunders was found guilty as charged in the indictments. The court sentenced him to life imprisonment for robbery and to two years' imprisonment for the firearm offense. At the penalty phase of the capital murder trial, the court heard evidence in aggravation and mitigation and considered the probation report as required by Code § 19.2-264.5. Resting its decision upon the "future dangerousness" predicate, Code § 19.2-264.4(C), the court sentenced Saunders to death for capital murder.

We have consolidated Saunders' appeal of the capital murder conviction with the automatic review of his death sentence accorded him by statute, Code § 17-110.1(A) and (F), and have given them priority on our docket as required by Code § 17-110.2.

## II. FACTS IN EVIDENCE

Under familiar principles, we view the evidence and the reasonable inferences it raises in the light most favorable to the Commonwealth. On the afternoon of July 17, 1989, Dale Guill withdrew five one-hundred dollar bills and five twenty dollar bills from his bank account and drove to an apartment occupied by Lacy

Johnson and Katrina Wilson[1]. At Guill's request, Lacy accompanied him on a ride through the neighborhood in search of a cocaine dealer. While Guill and Lacy were searching for cocaine, defendant Saunders and Levi Poole arrived at the apartment. As on previous visits, Saunders was carrying a leather pouch containing a pistol described of record as a .22 caliber "F. I. E. revolver" with a long, gold-colored barrel.

Lacy had taken the apartment keys, and Katrina, accompanied by Saunders and Poole, walked to a nearby market to get some beer. As they were leaving, Lacy and Guill arrived in Guill's car. They reported that their search had been unsuccessful. Out of Guill's hearing, Saunders exclaimed to Lacy, "I should rob this white [expletive deleted], but you know him."

With Guill in the driver's seat, Lacy beside him, Saunders in the back seat behind Guill, and Katrina in the back seat behind Lacy, the party resumed the search for narcotics. Guill parked the car near a car wash on Memorial Drive and waited for a drug dealer to appear. Katrina decided to leave the group, got the apartment keys from Lacy, and began the walk back to their apartment. At this point, Guill was showing Lacy a warrant he had received charging nonsupport of a child. Lacy testified that he heard a "bang", that Guill "lunged forward like he was heavy hit in the back and I looked back . . . it was a gold gun stuck in my face and Saunders tell me, 'Don't say nothing.' " Lacy asked him why he had shot Guill, and Saunders replied, "He's white."

Continuing, Lacy testified that Saunders put the gun in its leather pouch, got out of the car, opened the driver's door and, "leaning over in the car", spoke to the lifeless body before him, "Move [expletive deleted], get the hell off me". Lacy watched as Saunders "[w]ent to searching Dale's pockets", "snatched his chain off" his neck, raised his arm and "took his ring off his hand." As Saunders continued "cussing [Guill] out", Lacy stated, Saunders "brushed" away the hair, "looked at the wound on his head", and then "covered it back."

Saunders started to leave "and then he stopped and came back and snatched [Guill's] shirt off", "[s]tuffed it in the gas tank", and was "trying to light it with some matches." Running from the scene of the crime, Saunders and Lacy overtook Katrina on her

---

[1] Lacy and Katrina, engaged in March, were married in August, 1989.

way home. "I heard a noise," Katrina said, "It sound like a shot." Saunders replied, "Don't worry about it. I just killed that man."

Saunders offered Guill's wallet to Lacy. When Lacy refused, Saunders removed the contents, discarded the documents in a sewer, and threw the wallet in bushes along High Street. Lacy testified that "[t]hen he started counting, 'Hundreds, hundreds, hundreds'", inspecting the money taken from Guill's "wallet or his pockets, or wherever he got it." In her testimony, Katrina described the same event, quoting the same language. When they reached the Johnson apartment, Saunders "went upstairs and washed his hands" in order "[t]o get the blood off of them."

In a conversation with Saunders the next day, Katrina told Saunders that she and Lacy were so upset they "couldn't sleep". Katrina testified that Saunders replied, " 'Don't let that bother ya'll. I slept like a baby. Every time I think about it, I smell gunpowder.' " Lacy confirmed that testimony.

On July 19, 1989, Lacy reported the homicide to the police and assisted them in the recovery of Guill's wallet and the cards it contained. Saunders was arrested and imprisoned awaiting indictment.

Bernard Smith, a convicted felon confined to the same prison, testified that Saunders told him that he had "[s]hot [Guill] in the back of the head" with a ".22" caliber gun "down by the car wash on Memorial Drive." Asked what Saunders had "said about the shooting", Smith replied, "He just said he wouldn't give him the money so he shot him and then he . . . after he shot him, he got his jewelry and his money, and left." Smith added that Saunders had told him that "Lacy snitched on him . . . and that he wanted somebody to knock Lacy off."

The forensic pathologist who performed an autopsy on Guill's body testified that Guill had suffered "almost an instantaneous death" resulting from "a contact gunshot wound to the back of the head" with the bullet passing through "the most vital area of the brain which we call the brain stem". The bullet, removed from "one of the sinuses in the front of the face . . . above the right eye", was identified by the firearms expert as "a .22 caliber coated lead bullet".

Having made an unsuccessful motion to strike the Commonwealth's evidence, the defense called Betty Brandon as a witness. Brandon testified that, during a party held in her apartment the night of the murder, Lacy had told her that he, in company with

Saunders and Poole, "had followed this dude and they robbed him" and that he, Lacy, "was the one that got the money". On cross-examination, Brandon said that Lacy had been "doing drugs" during their conversation, and she acknowledged that she and Saunders "grew up together" and that she was "a friend of the defendant". Anthony Martin, a friend of Saunders' brother, testified that Lacy told him that he had "spent the dead man's money" but that he had not shot the man.

The defense introduced two other witnesses in the guilt phase. Saunders' mother testified that she had never seen her son with a gun. Sandra Mease testified that she had "dated" both Saunders and Guill, but not both during the same period of time. Mease said she knew nothing about the killing.

In rebuttal, the Commonwealth recalled Lacy who expressly denied engaging in the conversation Martin described. Concerning Brandon's testimony, Lacy said that Brandon was a drug addict, that he had not attended the party in her apartment, that he had not made the statement attributed to him, and that Saunders had never given him any of the money taken from Guill.

Upon consideration of the evidence and argument by counsel, the trial court convicted Saunders of the crimes charged in the indictment, ordered a pre-sentence report, and continued the case to hear further evidence in the penalty phase. We will detail later further facts relevant to particular issues addressed in this opinion.

## III. THE GUILT PHASE

On appeal, Saunders contends that the evidence was insufficient to support his conviction of capital murder in the commission of robbery. First, we review the proof of criminal agency.

Lacy Johnson, an eyewitness to the crime, testified that Saunders shot Guill in the head with a .22 caliber revolver, a weapon he and Katrina Wilson had seen him carrying on prior occasions. Moments after the shooting, Saunders told Katrina that he had "just killed that man" and began counting the hundred-dollar bills his victim had withdrawn from his bank account earlier that day. Later, at the Johnson apartment, Saunders washed blood off his hands. Awaiting trial in jail, Saunders told Bernard Smith, a fellow inmate, that he had shot Guill in the back of the head with a .22 caliber gun. The firearms experts identified the bullet removed from Guill's face as "a .22 caliber coated lead bullet".

■ On brief, Saunders charges that "the court did not give adequate weight to the prior criminal records of Lacy Johnson or Bernard Smith" and "did not place adequate emphasis on the marriage of Lacy Johnson and Katrina Wilson very shortly after the crime." For those reasons, he suggests, the testimony of those witnesses was unworthy of belief. But the credibility of witnesses and the weight to be accorded their testimony are questions for the fact finder, and "[w]hen the sufficiency of the evidence is attacked, the judgment of the trial court sitting without a jury is entitled to the same weight as a jury verdict". *Evans* v. *Commonwealth*, 215 Va. 609, 613, 212 S.E.2d 268, 271 (1975).

■ We think the evidence that Saunders was the criminal agent was overwhelming. Even so, Saunders challenges the sufficiency of the evidence that robbery was the motive for the killing. The defendant says that "none of the Commonwealth's witnesses advanced money as a motive" and that "[r]obbery was an afterthought in this case."

We disagree; the defendant overlooks uncontradicted testimony. Preceding the killing, Saunders made the statement that he "should rob" Guill. In prison following his arrest, Saunders acknowledged that the reason he had shot Guill was that "he wouldn't give him the money". Consequently, we hold that "the evidence supports the conclusion that the killing and the theft were interdependent objects of a common criminal design." *Edmonds* v. *Commonwealth*, 229 Va. 303, 310, 329 S.E.2d 807, 813, *cert. denied*, 474 U.S. 975 (1985).

## IV.  THE PENALTY PHASE

The trial court based its penalty decision upon the "future dangerousness" predicate, *i.e.*, a finding of "a probability . . . that [the defendant] would commit criminal acts of violence that would constitute a continuing serious threat to society". Code § 19.2-264.4(C). Saunders challenges the foundation of that finding and asks us to "reduce the sentence to one of imprisonment for life."

### A.  *Evidentiary Issues*

### (1)  Expert Testimony

Saunders complains that, in making its finding, "the court swept away the testimony of two expert psychiatrists". Saunders

says that Dr. Paul Mansheim, a defense witness, "could express no opinion on future dangerousness". However, in reply to a question summarizing the details of the commission of the crime and the defendant's comments and conduct following the murder, the witness agreed that "it's not . . . a good sign, when somebody is able to do something like that, under those circumstances." "I guess it demonstrates that he was dangerous, once," Dr. Mansheim added, but "I don't think it necessarily demonstrates that the person is going to do it again."

The other expert opinion to which Saunders refers was contained in a pre-trial letter written by Dr. Arthur Centor, a forensic clinical psychologist. Dr. Centor, called as an expert witness by the Commonwealth, had conducted an interview with the accused in August preceding the November trial. Based upon that interview and investigative reports furnished to him at that time, Dr. Centor wrote a letter to defense counsel in which he concluded that Saunders "does not show a high probability of future dangerousness". However, in the penalty phase following Saunders' conviction, Dr. Centor testified that "[i]f the trier of facts finds credibility in . . . statements [by the Commonwealth's witnesses], there was a danger that [Saunders] would commit further criminal acts of violence, that would constitute a continuing serious threat to society."

In *Edmonds* v. *Commonwealth, supra*, where we reviewed similar conflicts in the testimony of expert witnesses called by the defense and the Commonwealth, we affirmed a judgment imposing the death penalty. We did the same in *Pope* v. *Commonwealth*, 234 Va. 114, 128, 360 S.E. 352, 361 (1987), *cert. denied*, 485 U.S. 1015 (1988), where a psychiatrist opined that the defendant could "function adequately in a structured environment." Only recently, in *Stockton* v. *Commonwealth*, 241 Va. 192, 402 S.E.2d 196 (1991), we reaffirmed our earlier opinion upholding a death sentence, notwithstanding an expert's testimony that "Stockton would not 'pose a future continuing serious threat of violence to either himself or to others' if he 'continues to be incarcerated in the Virginia correctional system.' " *Id*. at 212 n.8, 402 S.E.2d at 208 n.8.

While, as we held in *Edmonds*, 229 Va. at 311, 329 S.E.2d at 813, citing *Barefoot* v. *Estelle*, 463 U.S. 880, 891 (1983), expert opinion on the question of future dangerousness is competent evidence, we reject the proposition implicit in Saunders' complaint

that the fact finder is not free to disregard such testimony. The question is a factual issue. It is peculiarly the function of the fact finder to determine what weight, if any, should be accorded expert opinion on that issue, whatever that opinion might be.

## (2)   Unadjudicated Crimes

The defendant assigns error to the "[a]dmission of evidence of unadjudicated crimes." He contends that this was a violation of his "right to due process" because, he says, "it permits a sentence of death to be imposed based on unreliable evidence". The defendant has reference to the testimony of three witnesses at the penalty phase.

Bernard Smith, a fellow inmate, testified that he had seen Saunders break a store window with a crowbar and steal a number of items including "a long barrel, .22" with "gold on it." Smith also testified that Saunders had "said something about him and Cody went to D.C. and killed some man up there, over some drugs and money".

Katrina testified that Saunders had told her that he "had killed a man in D.C., and took his reefer" on "[t]he weekend before" the Guill killing. Lacy testified that he had heard Saunders describe the murder victim in the District of Columbia as "[s]ome drug dealer that he knocked off . . . took his drugs and money."

■ We need not review the long line of precedents in which we have upheld the admission of such evidence,[2] because in its ruling on the penalty question, the trial court expressly stated that it was "not basing any of its findings upon any unadjudicated crimes, which have been admitted into evidence . . . . [T]he Court has excluded that testimony from any findings which it here makes."

[2] *See, e.g., Stockton v. Commonwealth*, 241 Va. 192, 209-10, 402 S.E.2d 196, 206 (1991); *Spencer v. Commonwealth*, 238 Va. 295, 317, 384 S.E.2d 785, 798-99 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1171 (1990); *O'Dell v. Commonwealth*, 234 Va. 672, 700, 364 S.E.2d 491, 507, *cert. denied*, 488 U.S. 871 (1988); *Gray v. Commonwealth*, 233 Va. 313, 346-47, 356 S.E.2d 157, 175-76, *cert. denied*, 484 U.S. 873 (1987); *Beaver v. Commonwealth*, 232 Va. 521, 529, 352 S.E.2d 342, 347, *cert. denied*, 483 U.S. 1033 (1987); *Pruett v. Commonwealth*, 232 Va. 266, 285, 351 S.E.2d 1, 12 (1986), *cert. denied*, 482 U.S. 931 (1987); *Watkins v. Commonwealth*, 229 Va. 469, 488, 331 S.E.2d 422, 436 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Poyner v. Commonwealth*, 229 Va. 401, 418, 329 S.E.2d 815, 827-28, *cert. denied*, 474 U.S. 865 (1985); *Peterson v. Commonwealth*, 225 Va. 289, 298, 302 S.E.2d 520, 526, *cert. denied*, 464 U.S. 865 (1983); *Quintana v. Commonwealth*, 224 Va. 127, 147-48, 295 S.E.2d 643, 653 (1982), *cert. denied*, 460 U.S. 1029 (1983).

The transcript of the penalty proceeding shows that in determining future dangerousness, the court relied exclusively upon evidence of circumstances surrounding the offense, Saunders' lack of remorse, his record of criminal convictions, and his conduct while awaiting sentencing. Consequently, we find no merit in Saunders' assignment of error.

## B. *Propriety of Penalty*

Pursuing his argument that the trial court erred in finding future dangerousness, Saunders contends that the sentence imposed was the product of passion and prejudice and that the penalty was excessive and disproportionate to that imposed in similar cases. In our consideration of those arguments, we will conduct an independent review of the record as required by Code § 17-110.1(C)(1) and (2).

### (1)   Circumstances Surrounding the Crime

■ The evidence to be considered in determining whether the defendant constitutes a future danger to society "may include the circumstances surrounding the offense". Code § 19.2-264.4(B). Saunders concedes, as he must, that the trial court "accepted the Commonwealth's version of the facts concerning Guill's death".

The uncontroverted facts of record identify this killing as a dispassionate, unprovoked execution of an unsuspecting victim, followed by a threat to use the murder weapon again if necessary to silence an eyewitness to the crime. *Cf. Delong v. Commonwealth*, 234 Va. 357, 371, 362 S.E.2d 669, 677 (1987), *cert. denied*, 485 U.S. 929 (1988).

Circumstances following commission of the offense are also relevant. Minutes after his attempt to incinerate his victim, Saunders told Katrina and Lacy that he had "killed that man" but not to "worry about it." Saunders was surprised to learn that they were too troubled to sleep when he had "slept like a baby." The recollection of what he had done only caused him to "smell gunpowder."

> Testimony that a defendant who committed murder . . . and then expressed no regret or remorse for the act he committed, is obviously proper testimony for a jury to consider in determining whether such person would in all probability commit criminal acts of violence in the future.

*Clark* v. *Commonwealth*, 220 Va. 201, 210, 257 S.E.2d 784, 790 (1979), *cert. denied*, 444 U.S. 1049 (1980).

### (2)   Criminal Record

█ The fact finder is expressly enjoined to consider "the past criminal record of convictions of the defendant". Code § 19.2-264.2. Thus, the legislature recognizes the danger that a repeat offender will repeat again.

As the trial court observed, Saunders' "past criminal record evidences a continuous path of criminal activity, which has not been deterred by probation, supervision or incarceration." That record shows that Saunders' history of criminal conduct began at the age of eleven. "Malicious Damage at Grove Park School" was the first of twelve charges referred to a juvenile court. Later, Saunders was convicted of eight felonies, including assault and battery of a police officer, and twelve misdemeanors. In the five years preceding the Guill murder, Saunders had been placed on probation on four separate occasions. Within a week after his third probation, he had been charged with new offenses. Following his fourth probation, he failed to report as required to his probation officer. After revoking suspensions of two five-year sentences previously imposed, the court suspended the revocation, imposed a jail sentence, and returned Saunders to probation for a period of one year. Before the end of that year, Saunders had been arrested and convicted of four additional offenses.

### (3)   Prior History

█ In addition to evidence of the circumstances surrounding the offense and the defendant's criminal record, the statute authorizes consideration of "evidence of the prior history of the defendant". Code § 19.2-264.4(C). That includes, of course, evidence of Saunders' most recent history. In his challenge to the propriety of the penalty, Saunders complains that the trial court "rendered a death verdict based largely on the feelings inspired by Mr. Saunders' post-trial conduct at the Danville City Jail."

The conduct to which the defendant refers occurred while he was incarcerated awaiting the sentencing hearing. At that hearing, the Commonwealth introduced the testimony of several police officers and a number of inmates of the city jail. In mutually consistent testimony, the witnesses described six incidents:

(1) Looking for a missing spoon, an officer conducted a search of Saunders' cell. Using profane language, Saunders challenged the officer's right to search, lit a match, and threw it on a bedsheet. The officer "stomped" the sheet to extinguish the fire and completed the search. As he was leaving, however, he noticed on the catwalk outside the cell another sheet afire. After the officer had extinguished the blaze, Saunders confessed and declared, "When ya'll leave, I'm gonna burn the whole damn jail down." Because he was "tired of jail rules", Saunders "took his jail regulation book . . . tore it in half, and threw it out in . . . the common area".

(2) On April 28, 1990, a fellow inmate accused Saunders of stealing an article from his cell. Saunders struck him in the face with his fist and "just kept on hitting" until three other inmates joined in the assault.

(3) During a routine search for contraband conducted the same day, officers found a razor concealed in the commode in Saunders' cell and retrieved from his sink a television antenna that had been "inserted completely hidden from sight, inside the drainport".

(4) On April 29, Saunders intervened on behalf of the aggressor in a fight between two inmates. Saunders beat the victim with a mop handle. The injuries inflicted by the assailants required a hospital examination. The victim testified that his rings were removed from his fingers and that Saunders told him that "he would kill [him] if [he] said anything to the guards".

(5) On April 30, following the two fights in which Saunders had participated, the officers asked him to accompany them to an isolation cell. Refusing to leave, Saunders said, "You might as well go ahead and get your riot gear, and come on." When taken to the isolation cell, he threatened to tear out the fluorescent light fixture in the ceiling. Climbing on the bunk, the commode, and the sink, Saunders tried to reach the fixture. The officers restrained him, locked him in the cell, and left. Another officer, observing the cell on a television monitor, saw Saunders climb back on the sink and remove the plastic cover and one of the bulbs from the light fixture. He refused to surrender the bulb and broke it against the bars. Later, he removed another bulb and did the same.

Using his foot, Saunders shattered the plastic cover. He picked up one piece "eight or ten inches" in length and "put it in his sock." Then, he broke off an arm's length of the plastic cover "two

to three inches" wide and "pointed" like "a spear" on one end. Carrying it in one hand, Saunders "paced around the cell with it . . . and then . . . pulled the rest of the lights down". The officers "couldn't get in there to feed him . . . he was standing up at the front of the cell, with this weapon, and they were scared".

Saunders' probation officer tried to persuade him to surrender the weapons he had made so that the officer would have "a chance to say something positive" about him at the sentencing hearing. Saunders first refused. "I wanna hurt someone else," he said. Naming three of the officers responsible for placing him in the isolation cell, he said that he wanted them "to come back here, because I wanna stab 'em in the throat with this". Finally agreeing to surrender the weapons, he told the probation officer, "The only reason I gave it up is because I won't gonna get a chance to get the ones I wanted to get".

(6) On May 2, Saunders set another fire in his cell. The sentencing hearing was held the next day as scheduled.

■ Saunders contends that the trial court was unduly influenced by the testimony of what he characterizes as "the parade of witnesses" from the jail, because, he says, they were "people known by the court". We think that this evidence was uniquely probative of future dangerousness. At a time when self-interest would prompt model behavior, Saunders acquired and secreted a razor and television antenna, fashioned two other potentially lethal weapons, expressed a desire to use those weapons against guards at the jail, and repeatedly assaulted, or attempted to assault, other inmates and correctional officials.

■ We hold that the evidence fully justifies the trial judge's finding of future dangerousness, and in our review of the record, we have discovered nothing whatever to support the argument that his decision to impose the death penalty was tainted by passion or prejudice.

### (4)  Disproportionality Analysis

■ Pursuant to Code § 17-110.1(E), we have accumulated, segregated, and indexed the records of all capital murder appeals reviewed by this Court, including those in which a life sentence was imposed. In making our determination whether a sentence of death in a particular case "is excessive or disproportionate to the penalty imposed in similar cases", Code § 17-110.1(C)(2), we give special attention to those in which that penalty was, as here,

based solely upon the "future dangerousness" predicate. Those cases are collected and cited in our recent opinion in *Quesinberry* v. *Commonwealth*, 241 Va. 364, 381-82, 402 S.E.2d 218, 229 (1991). Having compared the records in those cases with the record in this appeal, we are satisfied that "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

## V. CONCLUSION

Finding no error in the conduct of either phase of the defendant's trial and no cause to commute the death sentence to life imprisonment, Code §§ 17-110.1, we will affirm the judgment.

*Affirmed.*