COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Felton and McClanahan
Argued at Salem, Virginia


DESHAWN RUNTA BROWN
                                                              OPINION BY
v.        Record No. 2810-03-3                   JUDGE ROBERT J. HUMPHREYS
                                                            DECEMBER 21, 2004
CITY OF DANVILLE


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

John P. Light (Williams, Morrison, Light and Moreau, on brief), for
appellant.

James C. Martin, Assistant Commonwealth's Attorney (William H.
Fuller, III, Commonwealth's Attorney, on brief), for appellee.


Appellant Deshawn Runta Brown appeals his conviction, following a bench trial, for

obstruction of justice, in violation of § 23-1 of the Code of the City of Danville.  Brown argues

that the trial court erred in convicting him for obstructing justice, contending that the evidence

was insufficient to support his conviction, that the trial court improperly considered evidence that

should have been suppressed, and that his actions constituted a lawful attempt to resist an illegal

arrest.  Brown also argues that the trial court erred during the sentencing hearing because the trial

judge took into consideration the fact that he had granted Brown's motion to suppress and

dismissed the related drug charge.  For the reasons that follow, we hold that the trial court did not

err and, therefore, affirm Brown's conviction for obstruction of justice.

I.  BACKGROUND

In accord with settled principles, we review the evidence and all reasonable inferences

that may be drawn from that evidence in the light most favorable to the City of Danville, the

party prevailing below. <u>Archer v. Commonwealth</u>, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted); <u>Commonwealth v. Grimstead</u>, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "'In so doing, we must discard the evidence of the accused in conflict with that of the [City], and regard as true all the credible evidence favorable to the [City] and all fair inferences that may be drawn therefrom.'" <u>Watkins v. Commonwealth</u>, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998) (quoting <u>Cirios v. Commonwealth</u>, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988)).

So viewed, the evidence in this case establishes that, at approximately 7:30 p.m. on March 14, 2001, Officers Charles Reid and Terri Wilson were dispatched to investigate a domestic disturbance in the City of Danville. Both officers were in uniform, and they drove up to the residence in a marked police unit. When the officers arrived at the house, a woman "was exiting the house" and walking toward the officers. At the same time, Brown "was coming up from the back of the yard from the left of the house."

Officer Reid asked the woman "what was going on." However, Brown was "yelling and screaming and pointing at her," and "[e]very time she started to tell [Officer Reid]" anything, Brown would "interrupt[] her and wouldn't let her" speak. Officer Reid told Brown to "[c]alm down," and to "let [him] hear her and [then he would] hear [Brown's] side of the story." But "a[s] soon as she started again, [Brown] started yelling and screaming, and [Officer Reid] couldn't get anything out of her, because [Brown] was sitting there yelling and screaming at her." Officer Reid described Brown's demeanor as "irrational," noting that "[h]e wouldn't even acknowledge that I was there half the time."

After "a couple of minutes," Officer Reid told the woman that he was going to try to separate her from Brown. Officer Reid informed Brown that he would hear Brown's side of the story, but that he "was going to pat him down for weapons and separate him by putting him in

the back of the vehicle" until he "could find out what was going on with [the woman]." Officer Reid then "tried to get [them] apart from each other," but Brown "was still [] looking over top of [Officer Reid], yelling and screaming at her." Officer Reid indicated that he decided to frisk Brown "[b]ecause of [Brown's] demeanor and the way he was acting." Specifically, Officer Reid testified that he "didn't know what [Brown] would do" because Brown "just wasn't paying attention" and was "acting strange." Officer Reid also indicated that, based on Brown's behavior, he was concerned both for the safety of the officers and for the safety of the woman.

Once Officer Reid managed to separate Brown from the woman, Reid again told Brown that he was going to pat him down for weapons. Officer Reid then "[g]ot [Brown] to turn around [and] put his hands on the car," and Officer Reid "stepped around and started to frisk him down." However, before Officer Reid could complete the pat down, Brown took his hands off the car and "shoved his hands down in his pockets." Officer Reid told Brown "to get his hands out of his pockets and put [them] back on the car." Brown complied. But, when Officer Reid again tried to frisk Brown, he "shoved his hands down in his pockets again." Officer Reid told Brown to put his hands back on the car, and he told Brown that if he "[did] it again," he would "arrest [Brown] for impeding." Once Brown had placed his hands back on the car, Officer Reid tried to frisk Brown again. For a third time, Brown "shoved his hands down in his pockets." This time, however, when Officer Reid "got [Brown] to get his hands out" of his pockets, Brown had "something balled up in his right hand." Officer Reid then "grabbed [Brown's] right hand" and told Brown that he was under arrest.

As Officer Reid tried to get Brown's hand "behind his back," the two men "started struggling and went to the ground." [1] As they were struggling on the ground, Officer Reid

---

[1] At some point during the struggle, Brown tossed away the object in his hand, and the officers never recovered it.

- 3 -

sprayed Brown with mace, and, when Brown did not seem to be affected, Officer Wilson sprayed Brown with mace for a second time. The officers requested backup during the struggle because they "were wrestling with [Brown] on the ground for quite a while, trying to get him in the handcuffs."

After the officers managed to handcuff Brown, they "went ahead and started searching him." The officers "found some off-white chips in [Brown's] pockets" and placed the chips "on the hood of the car." At that point, Brown slammed his head down onto the hood of the car with enough force to split his own lip, and he then "started licking . . . and blowin[g]" the chips. Officer Reid "got [Brown] back off the hood of the car," and the two men "ended up going back down to the ground." Brown was "still kicking around," and Officer Reid "couldn't control him on the ground." At some point during this second struggle, Brown's pants "had fallen . . . down to around his knees," so Officer Reid told Officer Wilson to "go ahead and take [them] off of him, since they're all the way down there." Once the backup unit arrived, another officer "had to help [Officer Reid] take [Brown] and put him in the back of a patrol car."

Inside of Brown's pants, the officers found two pieces of paper and three pennies, all of which were coated in an off-white residue. The officers also discovered some loose, off-white solid material. Brown was arrested for "obstruct[ing] or interfer[ing] with [a] law-enforcement officer in the performance of his/her duty," in violation of § 23-1 of the Danville City Code, and for possession of cocaine, in violation of Code § 18.2-250.

Before trial, Brown moved to suppress "any and all evidence seized from his person, and any and all statements obtained from him," contending that, even though the officers had sufficient reasonable suspicion to support an investigative detention, the pat down itself was not justified because the officers did not suspect that Brown possessed any weapons on his person. Brown's counsel, the prosecutor, and the trial court agreed to address the motion to suppress

during the trial on the merits, and no separate suppression hearing was held. The trial court reserved ruling on the motion to suppress, but eventually granted the motion at the beginning of Brown's sentencing hearing. The trial court reasoned that, although there "would have been sufficient, reasonable suspicion" to support a pat down, the officer "never came right out and said that he thought he had a reasonable basis for the pat down."[2]

Brown also moved to strike the obstruction of justice charge, arguing that "the obstruction is nothing but derivative of the Fourth Amendment violation, predicated initially upon no reasonable, articulable basis to conduct a pat down search." The trial court overruled the motion to strike and convicted Brown for obstruction of justice.

At the sentencing hearing, the City requested that Brown receive the maximum sentence of twelve months, citing the fact that Brown had been convicted of various, related offenses on multiple prior occasions. The trial court sentenced Brown to twelve months in jail, with four months suspended, noting that "the Court cannot assume that what was disposed of was, in fact, cocaine, but I think the Court can consider all the circumstances as described by the testimony of the witnesses in the case." This appeal follows.

## II. ANALYSIS

Brown raises two issues on appeal. First, Brown contends that, for various reasons, the trial court erred when it convicted him of obstructing justice. Second, Brown argues that, during the sentencing hearing, the trial court improperly considered the fact that it had granted his motion to suppress and dismissed the charge for possession of cocaine. We disagree.

---

[2] By conducting the suppression hearing simultaneously with the trial on the merits, the City waived the provisions of both Code §§ 19.2-266 and 19.2-400 and thereby waived any opportunity to appeal the trial court's decision to grant Brown's motion to suppress. Thus, the trial court's decision to grant the motion to suppress is not at issue here.

A.  The Conviction for Obstruction of Justice

Brown argues that the trial court erred when it convicted him of obstruction of justice, reasoning that:  (1) the prosecution's evidence failed to satisfy the requirements of the Danville ordinance; (2) the trial court erred when it considered evidence subject to his motion to suppress to convict him of obstructing justice; and (3) he cannot be convicted of obstruction because he was merely using reasonable force to resist an illegal seizure.  We find no merit in any of these contentions.

1.  Sufficiency of the Evidence

"When the sufficiency of the evidence in a criminal case is challenged on appeal, we must view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the [party prevailing below]."  Walton v. Commonwealth, 255 Va. 422, 425-26, 497 S.E.2d 869, 871 (1988) (citing Dukes v. Commonwealth, 227 Va. 119, 122, 313 S.E.2d 382, 383 (1984)).  "Great deference must be given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony."  Id. (citing Saunders v. Commonwealth, 242 Va. 107, 113, 406 S.E.2d 39, 42 (1991)).  Thus, a trial court's judgment will not be disturbed on appeal "unless it is plainly wrong or without evidence to support it."  Id. (citing Code § 8.01-680; Dukes, 227 Va. at 122, 313 S.E.2d at 383).

The Danville City Code provides that:

> If any person, by threats or force, knowingly attempts to intimidate
> or impede a judge, magistrate, justice, juror, attorney for the
> Commonwealth, witness, any law-enforcement officer or City
> employee, lawfully engaged in the performance of his duties as
> such, or to obstruct or impede the administration of justice in any
> court, he shall be deemed to be guilty of a Class 1 misdemeanor.

Danville City Code § 23-1(b).[3]  Under the language of this ordinance, then, the prosecution must prove, beyond a reasonable doubt, that the defendant: (1) used threats or force, (2) with the intent to intimidate or impede the lawful administration of justice.[4]

Generally, obstruction of justice "does not require the defendant to commit an actual or technical assault upon the officer." Craddock v. Commonwealth, 40 Va. App. 539, 552-53, 580 S.E.2d 454, 461 (2003); see Love v. Commonwealth, 212 Va. 492, 494, 184 S.E.2d 769, 771 (1971).  However, "there must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action." Craddock, 40 Va. App. at 553, 580 S.E.2d at 461 (internal quotations omitted); Ruckman v. Commonwealth, 28 Va. App. 428, 429, 505 S.E.2d 388, 389 (1998).

Here, the evidence established that, when the officers first arrived at the residence, Brown was "yelling and screaming" in such a manner as to prevent the officers from speaking with the woman.  This initial conduct, however, is insufficient to meet the requirements of subsection (b) of the Danville ordinance.  Although words alone can support a conviction for obstruction of justice, see Polk v. Commonwealth, 4 Va. App. 590, 594, 358 S.E.2d 770, 772 (1987), those words generally must contain some manner of a threat intended to intimidate the police officer.

---

[3] Subsection (a) establishes a lesser offense, prohibiting the obstruction of justice "without cause" and while refusing "to cease such obstruction when requested to do so." Danville City Code § 23-1.  A violation of subsection (a) is punishable as a Class 2 misdemeanor.  It is not entirely clear whether Brown was convicted of violating subsection (a) or subsection (b) of this ordinance.  However, considering the prosecution's comment during sentencing that "this is an aggravated obstruction case," as well as the trial court's observation that it could impose a sentence of up to twelve months, it appears that Brown was convicted of violating subsection (b), which is punishable as a Class 1 misdemeanor. See Code § 18.2-11 (providing that the maximum sentence for a Class 1 misdemeanor is twelve months and that the maximum sentence for a Class 2 misdemeanor is six months).

[4] The language of the Danville ordinance closely resembles that of the Virginia statute, which is codified at Code § 18.2-460.

- 7 -

Here, there is no evidence on the record from which it could be inferred that Brown's "yelling and screaming" contained any threats intended to intimidate Officers Reid and Wilson. Although Officer Reid testified that he was concerned for the officers' safety, he also indicated that his safety concerns stemmed from Brown's general conduct rather than his choice of words.

However, once Brown began to struggle with Officer Reid, this additional conduct constituted a use of "force" sufficient to violate subsection (b) of the Danville ordinance. Specifically, Brown's struggle with Officer Reid was so violent that the officers had to mace Brown twice. Brown's kicking and squirming was aggressive enough to cause his pants to fall down around his knees. Brown slammed his own head down onto the police car with enough force to split his lip. Moreover, Officers Reid and Wilson needed the help of an additional officer before they were able to physically place Brown into a police car. These actions clearly amount to the use of "force" within the meaning of the Danville ordinance.

The evidence also supports the inference that Brown used this degree of force with the intent to prevent the officers from performing their law enforcement duties. Intent, like any element of a crime, may be proved by circumstantial evidence. Servis v. Commonwealth, 6 Va. App. 507, 524, 371 S.E.2d 156, 165 (1988). Here, the trier of fact could reasonably infer that Brown's entire interaction with the officers was calculated to prevent the officers from discovering the cocaine in his pocket and to impede them in their efforts to place him under arrest. Thus, there is more than ample evidence in the record to support the trial court's determination that Brown acted with the intent to prevent the officers from performing their law enforcement duties.

Accordingly, because Brown persistently and forcefully refused to be subdued, and did so with the intent to prevent the officers from carrying out their law enforcement duties, the trial

court's conclusion that Brown violated the provisions of the Danville ordinance was not plainly wrong or without evidence to support it.

### 2. Evidentiary Effect of the Motion to Suppress

Brown also argues that, because the trial court ultimately granted his motion to suppress, the trial court was not permitted to consider any of the events following the first attempted pat down when deciding whether Brown was guilty of obstructing justice. Brown contends that, because "the exclusionary rule applies not only to physical evidence wrongfully seized, but also precludes oral testimony," the officers' testimony describing the struggle with Brown was "fruit of the poisonous tree" and, therefore, also subject to the motion to suppress.

Initially, we note that Brown only moved to suppress "[1] any and all evidence seized from his person, and [2] any and all statements obtained from him." Noticeably absent from Brown's motion is a request to also suppress any evidence describing the evening's events.

Regardless, although Brown is correct that the exclusionary rule applies to oral testimony, see Wong Sun v. United States, 371 U.S. 471, 485-86 (1963), the testimony that is generally prohibited by this rule is derivative evidence relating to the suppressed tangible physical objects or verbal statements. The exclusionary rule does not, as Brown suggests, extend further and also prohibit testimony describing the defendant's own illegal actions following an unlawful search or seizure.

As noted by the Tenth Circuit, federal and state courts alike have uniformly rejected the argument that trial courts should suppress "evidence relating to [the defendant's] violence or threatened violence toward police officers subsequent to an unlawful search or seizure or a warrantless entry." United States v. Waupekenay, 973 F.2d 1533, 1537 (10th Cir. 1992); see also State v. Aydelotte, 665 P.2d 443, 447 (Wash. Ct. App. 1983) ("All courts which have

considered this issue . . . agree that evidence of post-entry assaults on police officers are outside the scope of the exclusionary rule."). As the Massachusetts Supreme Court aptly commented,

> These are not cases where the illegal entry leads to the seizure of evidence which produces an admission from a defendant. Nor are they cases where the illegal [police conduct] gives an officer knowledge of prior or ongoing criminal activity and hence bars testimony as to such evidence. What is present here is simply an attempt to suppress evidence which is a result of allegedly wilful [sic] acts of misconduct by [the defendant], whose provocation and perhaps ultimate defense may be found in the fact of the [police conduct] itself. The exclusionary rule does not reach this far.

Commonwealth v. Saia, 360 N.E.2d 329, 332 (Mass. 1977).

We agree with the overwhelming weight of authority on this issue, and therefore hold that, if a person engages in new and distinct criminal acts in response to unlawful police conduct, the exclusionary rule does not apply, and evidence of the events constituting the new criminal activity, including testimony describing the defendant's own actions, is admissible. See, e.g., United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997); see also United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (holding that the defendant's act of firing a gun in response to an unlawful police search constituted "an independent intervening act which purged the taint of the prior illegality"); Napageak v. State, 729 P.2d 893, 895 n.2 (Alaska Ct. App. 1986) ("'The better basis of distinction [between this situation and a proper application of the "fruit of the poisonous tree" extension of the Exclusionary Rule] is that no exploitation of the prior illegality is involved and that the rationale of the exclusionary rule does not justify its extension to this extreme. Application of the exclusionary rule in such fashion . . . would in effect give the victims of illegal searches a license to assault and murder the officers involved – a result manifestly unacceptable.'" (quoting 3 W. LaFave, Search and Seizure § 11.4(j), at 680 (1978) (alteration in original) (internal quotations omitted))); State v. Brocuglio, 826 A.2d 145, 152 (Conn. 2003) (adopting the "new crime" exception to the exclusionary rule, reasoning that "the limited

objective of the exclusionary rule is to deter unlawful police conduct – not to provide citizens with a shield so as to afford an unfettered right to threaten or harm police officers in response to the illegality"); People v. Klimek, 427 N.E.2d 598, 603 (Ill. 1981) (holding that evidence describing the unlawful conduct of the defendant following unconstitutional police conduct was admissible); State v. Boilard, 488 A.2d 1380, 1386-87 (Me. 1985) ("[I]t is beyond question that the exclusionary rule does not extend to suppress evidence of independent crimes taking place as a reaction to an unlawful arrest or search."); State v. Brown, 784 S.W.2d 903, 905 (Mo. Ct. App. 1990) (holding that the exclusionary rule did not apply to evidence of an assault committed by defendant in response to an illegal search); State v. Ottwell, 779 P.2d 500, 502-03 (Mont. 1989) (refusing "to extend the exclusionary rule to suppress evidence of a person's assaultive conduct towards a state employee who committed a Fourth Amendment violation," reasoning that "[s]uch evidence does not constitute the 'fruit of the poisonous tree'"); State v. Chamberlain, 783 P.2d 483, 485 (N.M. 1989) (admitting evidence that the defendant shot at police officers following an illegal entry into his home); People v. Townes, 359 N.E.2d 402, 406 (N.Y. 1976) (holding that the defendant's "action in pulling and attempting to fire the gun" after an unconstitutional seizure "serve[d] to render any connection between the lawless conduct of the police and the discovery of the challenged evidence . . . so attenuated as to dissipate the taint" of illegality (omission in original) (internal quotations omitted)); State v. Miller, 194 S.E.2d 353, 357-58 (N.C. 1973) (ruling that evidence of a police officer's murder after the officer illegally entered the defendant's premises was admissible); State v. Burger, 639 P.2d 706, 708 (Ore. 1982) (holding that an illegal warrantless entry cannot immunize subsequent criminal activity); State v. Mitchell, 848 S.W.2d 894, 896 (Tex. 1993) ("[I]t is beyond question that the exclusionary rule does not extend to suppress evidence of independent crimes against police officers taking place in reaction to an unlawful entry."); cf. Commonwealth v. Hill, 264 Va. 541, 548, 570 S.E.2d 805,

809 (2002) (affirming conviction for assault where defendant attempted to resist an illegal detention, noting that "'[c]lose questions as to whether an officer possesses articulable suspicion must be resolved in the courtroom and not fought out on the streets'" (quoting State v. Wiegmann, 714 A.2d 841, 849-50 (Md. 1998))); Woodson v. Commonwealth, 245 Va. 401, 406, 429 S.E.2d 27, 30 (1993) (citing United States v. Bailey, 691 F.2d 1009 (11th Cir. 1982), as standing for the proposition that "police may arrest for [a] 'new, distinct crime' [committed] by defendant in response to unlawful police conduct").

As noted by the Eleventh Circuit, "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." Bailey, 691 F.2d at 1017. As explained in Bailey,

> Unlike the situation where in response to the unlawful police action the defendant merely reveals a crime that *already* has been or is being committed, extending the fruits doctrine to immunize a defendant from arrest for *new* crimes gives a defendant an intolerable *carte blanche* to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct. This result is too far reaching and too high a price for society to pay in order to deter police misconduct.

Id. (emphases in original). Because "the gains from extending the [exclusionary] rule to exclude evidence of fresh crimes are small, and the costs high," we are compelled to conclude that "[a]n exclusionary rule that does little to reduce the number of unlawful seizures, and much to increase the volume of crime, cannot be justified." United States v. Pryor, 32 F.3d 1192, 1196 (7th Cir. 1994).

Accordingly, because Brown's "post-frisk" struggle with the officers constituted a separate and distinct criminal offense, we hold that the exclusionary rule did not apply to the officers' testimony describing the events that occurred after the initial attempted pat down. The trial court, therefore, did not err in considering evidence of Brown's struggle with the police when it convicted him for obstruction of justice.

- 12 -

3.  Use of Force to Resist an Unlawful Seizure

Brown also contends that the trial court erred when it convicted him of obstructing justice because his actions constituted a reasonable effort to resist an unlawful arrest.  We note that "when the issues are the lawfulness of an arrest and the reasonableness of force used to resist an unlawful arrest, the ultimate questions involve law and fact and are reviewed *de novo* on appeal." Brown v. Commonwealth, 27 Va. App. 111, 117, 497 S.E.2d 527, 530 (1998); see also Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000) (noting that appellate courts review *de novo* the question of whether a person has been seized in violation of the Fourth Amendment).

The first issue that must be addressed is whether, and at what point, Brown was "seized" within the meaning of the Fourth Amendment.  "A seizure occurs when an individual is either physically restrained or has submitted to a show of authority."  McGee v. Commonwealth, 25 Va. App. 193, 199, 487 S.E.2d 259, 262 (1997) (*en banc*).  In essence, "[w]hether a seizure has occurred for Fourth Amendment purposes depends upon whether, under a totality of the circumstances, a reasonable person would have believed that he or she was not free to leave." Id. at 199-200, 487 S.E.2d at 262.

As recently noted by the Virginia Supreme Court,

> Various factors have been identified as relevant in determining whether a seizure has occurred, including the threatening presence of a number of police officers, the display of weapons by officers, physical contact between an officer and a citizen, an officer's language or tone of voice compelling compliance, the retention of documents requested by an officer, and whether a citizen was told that he or she was free to leave.

Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003).

Here, Brown contends that he was "seized" within the meaning of the Fourth Amendment when Officer Reid informed Brown that he was going to pat him down and place him in the back

of the police car. We agree. Considering the totality of the circumstances, a reasonable person would not have felt that he was free to leave after being informed that he was going to be patted down and placed in the backseat of a police car. See, e.g., Walker v. Commonwealth, 42 Va. App. 782, 790, 595 S.E.2d 30, 34 (2004) (holding that a seizure had occurred when the officer "explained that he intended to pat down appellant" because, "[a]t this point, a reasonable person would not believe he could ignore the officer's requests and walk away"). Accordingly, once Brown agreed to go over to the police car, thereby submitting to Officer Reid's show of authority, a seizure had occurred. See California v. Hodari D., 499 U.S. 621, 626-27 (1991) (holding that a seizure does not occur until the suspect actually submits to the officer's assertion of authority); see also McCain v. Commonwealth, 261 Va. 483, 491, 545 S.E.2d 541, 546 (2001) ("A seizure does not occur in the absence of physical force used by a law enforcement officer or a defendant's submission to an officer's assertion of authority.").

Despite the findings of the trial court, we also hold, however, that when this seizure occurred, Officer Reid had probable cause to arrest Brown.[5] A police officer has probable cause to arrest when he believes, under the totality of the circumstances, that a crime has been or is being committed. See McGee, 25 Va. App. at 198, 487 S.E.2d at 261; see also Drumheller v. Commonwealth, 223 Va. 695, 699, 292 S.E.2d 601, 604 (1982). Here, Officer Reid had probable cause to believe that Brown, at the very least, had committed the offense of obstruction of justice. Although, as discussed above, Brown's actions prior to the attempted pat down would have been insufficient to sustain a conviction under subsection (b) of the Danville ordinance,

---

[5] The trial court predicated its decision to grant the motion to suppress on its conclusion that the officer was not justified in conducting the pat-down search, and it apparently did not consider the issue of whether the officer's actions were supported by probable cause to arrest. On appeal, however, we review *de novo* issues of law such as probable cause and reasonable suspicion. McGee, 25 Va. App. at 197, 487 S.E.2d at 261. Accordingly, we are not bound by the trial court's determination that the officers' pat-down search violated Brown's Fourth Amendment rights.

those actions would have amounted to probable cause to arrest Brown for violating subsection (a) of the ordinance.

Specifically, subsection (a) prohibits individuals from interfering with the administration of justice "without cause" and while refusing "to cease such obstruction when requested to do so." The evidence here indicates that, while the officers were attempting to find out what was going on, Brown was "yelling and screaming" so loudly that the officers were unable to speak with the woman. Officer Reid asked Brown to be quiet so that he could hear the woman's side of the story. Brown, however, kept "yelling and screaming." Brown's actions effectively prevented the officers from being able to communicate with the woman and investigate what had been happening. Because Brown was actively and persistently interfering with the officers' investigation, Officer Reid had probable cause to arrest Brown for misdemeanor obstruction of justice under subsection (a) of the Danville ordinance.[6]

Moreover, although Code § 19.2-74 provides that police officers are not authorized to arrest individuals for most misdemeanors (such as obstruction of justice), the statute also indicates that the officer may proceed with an arrest if the individual "shall fail or refuse to discontinue the unlawful act." Code § 19.2-74(a). Here, despite Officer Reid's request, Brown continued "yelling and screaming" and, therefore, continued the "unlawful act." Accordingly, Officer Reid was entitled to arrest Brown under the provisions of Code § 19.2-74.

Thus, when Officer Reid "grabbed [Brown's] right hand" and informed Brown that he was under arrest, that arrest was lawful because it was supported by probable cause to arrest Brown for violating subsection (a) of the Danville ordinance. When Brown engaged in the

---

[6] As we have noted elsewhere, and as was clearly the case here, "[d]omestic disturbances have a low flash point, and 'violence may be lurking and explode with little warning.'" McCracken v. Commonwealth, 39 Va. App. 254, 261, 572 S.E.2d 493, 496 (2002) (*en banc*) (quoting Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999)).

- 15 -

"post-frisk" struggle with the officers, he was therefore attempting to resist a *lawful* arrest. And, in <u>Polk v. Commonwealth</u>, 4 Va. App. 590, 358 S.E.2d 770 (1987), we clearly established that "an individual is not entitled to resist a lawful arrest." <u>Id.</u> at 596, 358 S.E.2d at 773. Accordingly, Brown's argument that his actions were justified as an attempt to resist an unlawful seizure is without merit.[7]

 B. <u>Application of the Fourth Amendment Exclusionary Rule During Sentencing</u>

During Brown's sentencing hearing, the trial judge noted that "the Court cannot assume that what was disposed of was, in fact, cocaine, but I think the Court can consider all the circumstances as described by the testimony of the witnesses in the case." Based on this language, Brown argues that the trial court's consideration of "all the circumstances" encompassed evidence that had been suppressed, including the dismissed charge for possession of cocaine. Whether the exclusionary rule applies during sentencing proceedings is apparently an issue of first impression in Virginia. We now hold that the exclusionary rule does not apply during sentencing proceedings and, therefore, affirm the judgment of the trial court.

The exclusionary rule, created with the intent of deterring police misconduct, "operates 'as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than [to protect] a personal constitutional right of the party accused.'" <u>United States v. Leon</u>, 468 U.S. 897, 906 (1984) (quoting <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974)); <u>see also</u> <u>Derr v. Commonwealth</u>, 242 Va. 413, 422, 410 S.E.2d 662, 667 (1991). However, "[o]ur cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede

---

[7] To the extent that Brown's conviction may have been predicated on his pre-arrest conduct, we note that he had no right to forcibly resist the attempted pat down, regardless of whether the initial detention was justified. <u>See</u> <u>Hill</u>, 264 Va. at 548, 570 S.E.2d at 809 (holding that "a person in this Commonwealth does not have the right to use force to resist an unlawful detention or 'pat-down' search").

unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734 (1980). "Accordingly, '[as] with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" Leon, 468 U.S. at 908 (quoting Calandra, 414 U.S. at 348).

The sentencing phase of a trial is not an area where the "remedial objectives" of the exclusionary rule would be "most efficaciously served." The ultimate goal of a sentencing proceeding is to impose a "fair, accurate, and individualized" sentence on a defendant whose guilt has already been adjudicated. United States v. Brimah, 214 F.3d 854, 857 (7th Cir. 2000). And "[a] sentence can be properly tailored to fit an individual defendant only to the extent that the judge is aware of the major facts relevant to needed correction." United States v. Vandemark, 522 F.2d 1019, 1021 (9th Cir. 1975). Thus, "'a sentencing judge [may typically] exercise wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed.'" United States v. Torres, 936 F.2d 321, 324 (3d Cir. 1991) (quoting Williams v. New York, 337 U.S. 241 (1949)); see also United States v. Tucker, 404 U.S. 443, 446 (1972) ("[The sentencing] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."). For this reason, the admissibility of evidence during sentencing proceedings does not necessarily turn on whether that same evidence was admissible during the guilt phase of the trial. See, e.g., Watkins v. Commonwealth, 229 Va. 469, 487-88, 331 S.E.2d 422, 436 (1985) (holding that, in a capital murder case, "evidence of prior unadjudicated criminal conduct, while generally not admissible in the guilt phase of . . . trial, may be used in the penalty phase to prove the defendant's propensity to commit criminal acts of

violence in the future"); see also Commonwealth v. Shifflett, 257 Va. 34, 44, 510 S.E.2d 232, 236 (1999).[8]

Extending the exclusionary rule to sentencing proceedings, however, "would have a detrimental effect on the traditional judicial prerogative of sentencing an offender based upon all the relevant and reliable information that is available." United States v. Tauil-Hernandez, 88 F.3d 576, 581 (8th Cir. 1996). In contrast, the deterrent effect of extending the exclusionary rule to sentencing proceedings "would be so minimal as to be insignificant." United States v. Lee, 540 F.2d 1205, 1211 (4th Cir. 1976). Thus, "the benefits of providing sentencing judges with reliable information about the defendant outweigh the likelihood that allowing consideration of illegally seized evidence will encourage unlawful police conduct." United States v. Tejada, 956 F.2d 1256, 1263 (2d Cir. 1992); see also Brimah, 214 F.3d at 858 (noting that application of the exclusionary rule during sentencing "would inhibit the ability of sentencing judges to impose fair and accurate punishments on defendants"); cf. Calandra, 414 U.S. at 351-52 (declining to apply exclusionary rule to grand jury proceedings where application of the rule would have "achieve[d] a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury").

---

[8] We note that the evidence that may be introduced during sentencing is not entirely unlimited in scope, for "[d]ue process does require that information relied upon when determining an appropriate sentence have some minimal indicium of reliability and bear some rational relationship to the decision to impose a particular sentence." United States v. Angulo, 927 F.2d 202, 204 (5th Cir. 1991) (internal quotation marks and citation omitted). "For this reason, a sentencing judge [may] not consider coerced confessions, convictions obtained without affording the defendant the benefit of counsel, or other information whose reliability [is] questionable because of constitutional deprivations." United States v. Lynch, 934 F.2d 1226, 1236 (11th Cir. 1991). However, because "evidence seized in violation of the Fourth Amendment – unlike an involuntary confession taken in violation of the Fifth Amendment – is inherently reliable," United States v. Tejada, 956 F.2d 1256, 1261 (2d Cir. 1992), most illegally seized evidence will possess sufficient indica of reliability to satisfy due process requirements. See also Lynch, 934 F.2d at 1236 ("Evidence obtained as the result of an unconstitutional search is not inherently unreliable; rather, . . . it is excluded at trial in order to deter police from making illegal searches.").

As noted by the Seventh Circuit, "[a]lthough there is certainly a small risk that . . . law enforcement officials will intentionally violate a defendant's Fourth Amendment rights in order to increase a sentence, 'we doubt that there are many police officers who would risk the fruits of prior legitimate law enforcement activities in so cynical a fashion.'" Brimah, 214 F.3d at 859 (quoting Tauil-Hernandez, 88 F.3d at 581); see also United States v. Ryan, 236 F.3d 1268 (10th Cir. 2001) (noting that extending the exclusionary rule to sentencing proceedings would have a minimal deterrent effect because, "'in the usual case, law enforcement officers conduct searches and seize evidence for the purpose of obtaining convictions, not for the purpose of increasing the sentence in a prosecution'" (quoting United States v. Graves, 785 F.2d 870, 873 (10th Cir. 1986))). Moreover, "the application of the exclusionary rule to the government's case-in-chief still provides strong incentives for law enforcement officials to follow proper procedure in order to build as strong a case as possible against the defendant during the conviction phase of trial." Brimah, 214 F.3d at 859; cf. Anderson v. Commonwealth, 251 Va. 437, 440-41, 470 S.E.2d 862, 863 (1996) (holding that the exclusionary rule does not apply during probation revocation hearings absent a showing of bad faith, noting that "the exclusionary rule already served its deterrent purpose when the illegally seized evidence was excluded in the [earlier] criminal proceeding").

Without exception, every other jurisdiction to address this issue has agreed that the exclusionary rule is generally inapplicable during the sentencing phase of a trial. See, e.g., United States v. Acosta, 303 F.3d 78, 84-86 (1st Cir. 2002) (holding that the exclusionary rule does not apply during sentencing proceedings, but leaving open the question "of whether the exclusionary rule would bar the use of evidence when police intentionally act in violation of the Fourth Amendment in order to increase a defendant's sentence"); Ryan, 236 F.3d at 1271-73 (trial court did not err in considering illegally obtained evidence during sentencing); Brimah, 214

F.3d at 859 (same); Tauil-Hernandez, 88 F.3d at 581 (same); United States v. Kim, 25 F.3d 1426, 1435 (9th Cir. 1994) (admitting illegally seized evidence during sentencing but leaving open the question of whether the rule applies when police intentionally act illegally to enhance defendant's sentence); United States v. Montoya-Ortiz, 7 F.3d 1171, 1181-82 (5th Cir. 1993) (same); United States v. Jenkins, 4 F.3d 1338, 1344-45 (6th Cir. 1993) (permitting introduction of illegally seized evidence after finding no indication that the evidence was obtained to enhance the defendant's sentence); Tejada, 956 F.2d at 1263 ("Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing, even if that evidence has been seized in violation of the Fourth Amendment."); Lynch, 934 F.2d at 1236-37 (admitting illegally obtained evidence during sentencing but reserving question of whether suppression would be necessary if illegal search was performed with the purpose of increasing defendant's sentence); United States v. McCrory, 930 F.2d 63, 69 (D.C. Cir. 1991) (same); Torres, 926 F.2d at 325 (same); Lee, 540 F.2d at 1212 (concluding that "the disadvantages of applying the exclusionary rule at sentencing are large, the benefits are small or non-existent, and that the rule should therefore not be extended").[9]

Accordingly, we hold that, because the exclusionary rule does not apply during sentencing proceedings, the trial court may, in its discretion, admit evidence that had been suppressed during the guilt phase of trial. Thus, the trial court in this case did not err when it considered "all [of] the circumstances" – including evidence that may have been subject to the motion to suppress – during Brown's sentencing proceedings.

---

[9] We need not decide today whether proof that the officers illegally seized the suppressed evidence for the sole purpose of enhancing the defendant's sentence will suffice to remove the case from the general rule that the exclusionary rule does not apply in the context of sentencing proceedings. Cf. Verdugo v. United States, 402 F.2d 599, 612 (9th Cir. 1968); United States v. Gilmer, 811 F. Supp. 578, 584 (D. Colo. 1993).

## III. CONCLUSION

For these reasons, we find that the trial court did not err and, therefore, affirm Brown's conviction for obstruction of justice.

Affirmed.