COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Felton, Judge McClanahan and Senior Judge Coleman
Argued at Salem, Virginia


CHARLIE BERT SLOAN, III

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0899-07-3                JUDGE ELIZABETH A. McCLANAHAN
                                                    OCTOBER 7, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Charles J. Strauss, Judge

Charles C. Cosby, Jr. (Boone, Beale & Cosby, on brief), for
appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Charlie Bert Sloan, III, appeals his conviction of arson in violation of Code § 18.2-79

(setting fire to an unoccupied storage building).  He argues the evidence was insufficient to

support his conviction and the trial court erred in failing to grant him a new trial due to a juror's

hearing impairment.  We affirm the trial court.

I.  BACKGROUND

On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citation omitted).

That principle requires us to "'discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and

all fair inferences that may be drawn therefrom.'"  Kelly v. Commonwealth, 41 Va. App. 250,

254, 584 S.E.2d 444, 446 (2003) (en banc) (quoting Watkins v. Commonwealth, 26 Va. App.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

335, 348, 494 S.E.2d 859, 866 (1998)). See also Bolden v. Commonwealth, 275 Va. 144, 147-48, 654 S.E.2d 584, 586 (2008); Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006); Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005); Walton v. Commonwealth, 255 Va. 422, 425-26, 497 S.E.2d 869, 871 (1998).

Sloan and Harry Manley stored items in an unoccupied house Manley rented from Willie Statzer. Sloan and Manley sold their items either out of the house or at a nearby flea market. When Manley saw Sloan drinking on the premises, he told Sloan to leave the property and not return. Manley also told Sloan he would meet Sloan at the property to retrieve Sloan's stored items if Sloan phoned Manley first. Sloan told Manley he wasn't going anywhere and that if he couldn't sell anything out of the house nobody else would either. After Manley called the Pittsylvania Sheriff's Department, Sloan left the premises. Manley purchased a new lock and placed it on the door. At that time, approximately ninety percent of the items stored in the house belonged to Sloan. After Sloan left, he never called Manley to obtain his items.

Teresa Berg knew Manley and Sloan had a falling out and recalled that Manley changed the lock on the door to keep Sloan from getting back into the house. Berg testified Sloan threatened to burn the house saying to Berg over the telephone, "I'll burn the mother f------ to the ground and he [Manley] won't have it."

One evening at approximately 2:30 a.m., Lakendra Clark, Marquita Ford, and Lakeisha Hereford were driving by the house and noticed flames and black smoke at the bottom of the door. They observed a white male in a red shirt and blue jeans, pants or overalls standing in front of the door. They turned around to pass the house again, and the man was no longer standing there. After turning around again, the ladies noticed a man in a red shirt sitting in a dark gray or dark blue car at a stop sign across the road from the fire. This was the only other vehicle on the road. They turned around again and saw that the same vehicle had moved to a

store parking lot also across the road from the fire. According to Ford, the driver of the vehicle turned off his lights and was "watching [the house] burn." Ford described the driver as having hair "all over his head" and "very similar to the person [she] saw standing in the doorway." After Clark called 911 and the firefighters arrived, the ladies directed them to the vehicle across the road from the fire.

Wayne "Buddy" Adkins of the Ringgold Volunteer Fire Department, one of the firefighters who responded to the call, observed the vehicle and the driver, later identified as Sloan. Adkins described the driver as having "bushy hair." When Adkins walked up on the front porch of the house, he noticed a stream of some type of substance on the front door and a large puddle of a clear substance on the front porch that smelled of kerosene. The firefighters extinguished the fire with water. Timothy Chesher and Winfred Tate, volunteer firefighters who also responded to the call, moved their vehicles into the lot where Sloan was sitting in his vehicle. Chesher pulled in front of the vehicle, and Tate pulled in behind the vehicle in an effort to block Sloan from leaving. When Chesher and Tate pulled their vehicles in around Sloan's vehicle, Sloan backed up and swerved around Chesher's vehicle nearly hitting both vehicles in the process. Sloan drove off heading east in the westbound lane, and Chesher and Tate followed Sloan in the eastbound lane. An oncoming vehicle in the westbound lane then forced Sloan across the median and into the eastbound lane as Chesher and Tate continued to follow him with red lights located on their dashboards activated. During the chase, a white jug flew through the air hitting Chesher's vehicle. After Sloan crossed over into North Carolina, he turned left and ended up in a drainage ditch where he attempted to get out to no avail. At that time, the North Carolina state police and county deputies from Person County, North Carolina, arrived and took Sloan into custody. Chesher and Tate described Sloan as wearing a red shirt and blue jeans or

overalls.  A photograph taken of Sloan after his arrest showed him wearing blue jeans, a gray shirt, and red jacket.

Steven Bowman, Fire Marshal for Pittsylvania County who investigated the fire, determined the fire to be of an incendiary origin.  Thomas Simpson, a forensic scientist with the Department of Forensic Science laboratory in Roanoke, testified that wood debris from the door contained a flammable mineral spirits petroleum product commonly found in paint thinners and charcoal starter fluids.

Sloan moved to strike the evidence against him after the Commonwealth rested its case.  Sloan conceded the fire was deliberately set but argued the evidence did not establish that he was the person who set the fire.  The trial court denied the motion to strike, and the jury convicted Sloan of arson.

When the jury returned its verdict of guilty, Sloan moved the jury be polled.  During the polling of the jury, the deputy clerk twice asked Juror Linda McDaniel if this was her verdict to which McDaniel gave no response.  An unidentified juror remarked that McDaniel "can't hear very well."  When the deputy clerk asked where McDaniel was located, the unidentified juror indicated that McDaniel "was at the very end."  The deputy clerk again asked McDaniel if this was her verdict to which McDaniel responded "yes."  After the jury was polled, the court asked defense counsel if he was "satisfied the verdict is unanimous" and defense counsel responded, "Yes, your honor."  After argument and deliberations on the sentencing, the jury returned its sentencing verdict fixing Sloan's punishment at six (6) years and ten thousand dollars ($10,000).  After the jury was released, Sloan moved that the jury's verdict be stricken as contrary to the law and evidence, which motion the court denied.

Prior to sentencing, Sloan moved for a new trial on the grounds Juror McDaniel suffered a hearing impairment that prevented Sloan from receiving a fair trial.  The trial court held a

hearing in which Sloan called Juror Peggy Johnson, believed to be the unidentified juror, to testify. Upon questioning by defense counsel, Johnson could not recall any particular juror being called to respond more than once during polling or that any juror was hard of hearing. Johnson did not recall that any juror had given her an indication that he or she could not hear what was going on during the trial.

When defense counsel called Juror McDaniel to testify, she appeared to have difficulty hearing or understanding him until he was instructed by the trial court to stand near a microphone. According to McDaniel, when she was twenty-eight years old she had the mumps, which thereafter affected her hearing. McDaniel said it was not necessary for her to wear a hearing aid or read lips but if "words are blurry" they don't "come in clear." McDaniel testified that during the trial she sat in the chair closest to the witness stand, heard the majority of the testimony, listened to both sides, did not need to ask other jurors what any of the witnesses said during their testimony, and arrived at her decision of her own free will. McDaniel also testified she understood all of the questions the judge asked of the jurors at the start of the trial and understood counsel during their questioning of the jury. McDaniel stated she remembered the judge asking the jurors if there was any reason why any of them could not render a verdict in the case and she did not think her hearing problem would prevent her from doing so. She also testified that during jury deliberation, she did not hear anything from other jurors that she missed during the trial testimony.

The trial court denied Sloan's motion for a new trial. Although the court acknowledged McDaniel had a hearing problem, the court found that based on the evidence at the hearing and what the court observed about the juror during trial, there were no grounds for a mistrial and that the juror was capable of discharging her duty.

## II.  ANALYSIS

On appeal, Sloan argues the evidence was insufficient to convict him of arson and he was denied a fair trial due to Juror McDaniel's hearing problem.

### A.  Sufficiency of Evidence

Sloan contends the evidence was insufficient to prove he was the criminal agent who set the fire.

In reviewing the sufficiency of the evidence, "the judgment of the trial court sitting without a jury is entitled to the same weight as a jury verdict."  Saunders v. Commonwealth, 242 Va. 107, 113, 406 S.E.2d 39, 42 (1991).  "The trial court's judgment will not be set aside unless plainly wrong or without evidence to support it."  Hunley v. Commonwealth, 30 Va. App. 556, 559, 518 S.E.2d 347, 349 (1999).  "The credibility of a witness and the inferences to be drawn from proven facts are matters solely for the fact finder's determination."  Marable v. Commonwealth, 27 Va. App. 505, 509, 500 S.E.2d 233, 235 (1998).  "This Court does not substitute its judgment for that of the trier of fact."  Hunley, 30 Va. App. at 559, 518 S.E.2d at 349 (citing Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992)).  The only relevant inquiry is "whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Haskins v. Commonwealth, 44 Va. App. 1, 7, 602 S.E.2d 402, 405 (2004) (citation and footnote omitted); Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*).

To prove Sloan guilty of arson, the Commonwealth was required to prove two elements: (1) that the fire was of an incendiary origin; and (2) that Sloan was the guilty agent who started the fire.  Simmons v. Commonwealth, 208 Va. 778, 782, 160 S.E.2d 569, 573 (1968).  The Commonwealth presented expert testimony establishing that the fire was of an incendiary origin,

and Sloan conceded at trial that the fire was deliberately set. Thus, the only issue before the Court is whether the evidence was sufficient to prove that Sloan was the guilty agent. As the Supreme Court of Virginia has noted, "[a]rson is a crime of stealth. The perpetrator is seldom observed, seldom confesses, and, if skillful, leaves few traces of his presence. The proof is often necessarily circumstantial . . . and [circumstantial proof] is often more reliable than the accounts of eyewitnesses." Cook v. Commonwealth, 226 Va. 427, 432-33, 309 S.E.2d 325, 329 (1983).

The circumstantial evidence was sufficient to prove Sloan was the guilty agent. Prior to the fire, Manley ejected Sloan from the property and changed the lock to prevent Sloan from gaining access to the house. After his falling out with Manley, Sloan said if he could not sell anything out of the house, no one else would either after which he threatened to burn the house to the ground. The witnesses to the fire observed a white male with a red top and blue pants or overalls standing directly in front of the door when the fire began. It was certainly reasonable for the jury to infer this was the same man sitting in his car watching the fire and later identified as Sloan.[1] See Underwood v. Commonwealth, 218 Va. 1045, 1049, 243 S.E.2d 231, 233 (1978) ("[I]t is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts." (quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976))). Sloan fled from the firefighters once they approached him and attempted to prevent him from leaving. "Flight following the commission of a crime is evidence of guilt, and the jury may be so instructed" as it was here. Clagett v. Commonwealth, 252 Va. 79, 93, 472 S.E.2d 263, 271 (1996). Moreover, there was no evidence that anyone else was present at the scene of the fire other than the witnesses who reported the fire. See Cook, 226 Va. at 433, 309 S.E.2d at 329 (Court noting

---

[1] Although Sloan argues he would not have set fire to a house containing his own items, the evidence established he sat in his vehicle watching the fire without taking any action to protect his property.

absence of anyone other than defendant on night of fire). "Thus, [Sloan's] presence, considered in the light of all the evidence against him, . . . is sufficient to support the jury's finding that he was, beyond a reasonable doubt, the criminal agent." Id.

## B.  Qualification of Juror

Sloan also contends he is entitled to a new trial because Juror McDaniel's hearing impairment disqualified her from performing her duty and thus denied him a fair trial.

"The right of an impartial jury requires that the jury be capable of understanding the factual issues that it must resolve." Mason v. Commonwealth, 255 Va. 505, 509, 498 S.E.2d 921, 923 (1998). An objection to a juror on account of a disability may be made after the jury is sworn with leave of court. Code § 8.01-352(A). The disability must be "such as to probably cause injustice in a criminal case to the Commonwealth or to the accused." Code § 8.01-352(B). And in determining whether a juror's disability was "such as to probably cause injustice" to the accused, "upon appellate review, we must give deference to the trial court's decision whether to remove a juror because the trial court sees and hears the juror." Mason, 255 Va. at 510, 498 S.E.2d at 924. We decline Sloan's invitation to "assume prejudice" and adopt a standard other than that adopted in Virginia requiring us to give deference to the trial court's decision.

Although McDaniel had a hearing problem, the trial court examined Juror McDaniel and was satisfied that she was capable of performing her duty based on its observations at trial and the evidence at the hearing.[2] The trial court concluded McDaniel "is very clear that she decided

---

[2] During the hearing, McDaniel evidently was having trouble understanding defense counsel before he was instructed to stand close to one of the microphones. But after the trial court instructed counsel to stand close to a microphone, McDaniel only once asked defense counsel to repeat a question and only once indicated she did not understand a question from counsel for the Commonwealth. It is not clear from the record whether McDaniel did not hear these questions or simply did not understand them. The trial court was "convinced from listening to [McDaniel] she did all she could to hear what the witnesses were saying . . . and did what [the court] asked [her] to do."

[the case] on her own and not because of what somebody else said." And the court found "no evidence she had to fill in the blanks with what other people said."[3] Giving due deference to the trial court's findings, the record "fails to demonstrate that the challenged juror had a disability which was such as to probably cause injustice" to Sloan. Id.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

---

[3] Although Sloan argues McDaniel only heard a "majority" of the testimony, the inability to quantify what she may or may not have heard would apply to all jurors, as it is impossible to know the attention span of any individual who serves on a jury. And there is no evidence McDaniel was incapable "of understanding the factual issues that [she was required to] resolve." Mason, 255 Va. at 509, 498 S.E.2d at 923.