COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Petty and McCullough
Argued at Lexington, Virginia


ANTHONY VICTOR ECHAVARRY

v.      Record No. 1010-11-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WILLIAM G. PETTY
MAY 15, 2012


FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
Herman A. Whisenant, Jr., Judge Designate

Franklin B. Reynolds, Jr., for appellant.

John W. Blanton, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Anthony Victor Echavarry appeals his convictions for possession of heroin and possession

of marijuana.  He argues that the trial court should have granted his motion to suppress heroin and

marijuana found in the course of a search of his personal belongings as he was admitted to jail

pursuant to arrest warrants for unrelated charges.  The unrelated charges arose from a domestic

incident involving Echavarry and his live-in girlfriend.  Several police officers entered Echavarry's

house without a warrant, asked to speak with his girlfriend outside, and then obtained information

from her.  Based upon that information, the officers arrested Echavarry for domestic violence

charges.  The officers then took Echavarry before a magistrate and obtained arrest warrants.

Pursuant to the warrants, Echavarry was admitted to jail, which led to the discovery of the

controlled substances at issue.

Echavarry assigns error to the trial court's holding "that the entry [into the home] by [the

police] was lawful," reasoning that the entry resulted in his "illegal and unconstitutional arrest,"

which in turn "led to the discovery of the contraband that [is] the basis of the charges on appeal." According to Echavarry, the warrantless entry was unlawful because neither exigent circumstances nor any other exception to the warrant requirement of the Fourth Amendment existed at the time of the entry.[1] For the reasons set forth below, we affirm the judgment of the trial court denying the motion to suppress.

## I. BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)). On April 10, 2010, Remington Police Chief Thomas Beecherl responded to a police dispatch reporting an anonymous report of a woman screaming for help at 309 West Washington Street. Chief Beecherl had been to the residence previously for "domestic situations." The tip stated that "a female came outside the house screaming for help and had a cut above her eye, that the boyfriend came out looking crazy, wild and upset, [and] that the female then went into the residence." The complainant also stated that he "heard a lot of banging" and that "there was a baby in the house."

---

[1] Echavarry further assigns error to the trial court, asserting that it "erroneously relied upon a materially incorrect interpretation of the observations of the officers when responding to a dispatcher's request to go to [Echavarry's] home." This assignment of error is without merit. The trial court noted that when the officers arrived outside the home, they observed "clothes strewn about on the steps and on the ground." Echavarry alleges the use of the word "strewn" by the court was improper, as the officers testified that the clothing was actually in plastic bags in an orderly fashion. Echavarry has not accurately described the officers' testimony. One of the officers testified that "there [were] bags of clothes in the front yard and on the steps leading into the home," and "[i]t appeared that they were thrown outside." The other officer confirmed this description. Accordingly, the trial court accurately described the officers' observations, and thus no error occurred.

Upon arrival, Beecherl observed clothes in bags thrown on the lawn and the steps leading to the house, as if they had been thrown out the front door. He knocked on the front door of the home, and Echavarry's live-in girlfriend opened the door, holding a thirteen-month-old infant in her arm. At first, Beecherl testified that the girlfriend "let [him] in" the house. However, on cross-examination, Beecherl stated that he could not remember if he asked whether he could enter the house or whether the girlfriend said anything to him about entering the house. Rather, he could only testify that "she opened the door" and that in response he "stepped through the threshold."[2] At that point, he initially asked the girlfriend about the disturbance, but she did not immediately respond to his inquiry, appearing hesitant "because she knew who [Beecherl] was" since he had "been there for domestic situations in the past." Once inside, Beecherl observed holes in the wall and Echavarry sitting on the couch in the living room. Another officer, Deputy Rawls, arrived approximately around the same time as Beecherl, and entered the home through the front door that was still open. Rawls went with the girlfriend into the kitchen to talk to her, while Beecherl stayed in the living room with Echavarry.

---

[2] Although argued by the Commonwealth on appeal, we do not address whether the girlfriend consented to the entry into the house. The testimony from the officers was vague on this point. Moreover, because the Commonwealth did not rely on consent as a justification for the entry, the trial court made no factual findings on the issue. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.'" Ohio v. Robinette, 519 U.S. 33, 40 (1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). "Both the presence of consent to search and any related limitations are factual issues for the trial court to resolve after consideration of the attendant circumstances." Bynum v. Commonwealth, 23 Va. App. 412, 418, 477 S.E.2d 750, 753 (1996). Therefore, we have an insufficient basis in the record before us to conclude that the officer's entry was consensual under an application of the right result for the wrong reason doctrine. See Banks v. Commonwealth, 280 Va. 612, 618, 701 S.E.2d 437, 440 (2010) (holding that we may apply the right result for the wrong reason doctrine only when "the record demonstrates that all evidence necessary to the alternative ground for affirmance was before the circuit court and, if that evidence was conflicting, how it resolved the dispute, or weighed or credited contradicting testimony").

Shortly thereafter, Lt. Timothy Benjamin arrived at the house. Seeing both officers inside, Benjamin entered the house. In addition to the holes in the wall, he also observed a broken home telephone on the floor and things in disarray. He asked the girlfriend to accompany him outside, and she did so. While outside, the girlfriend told Benjamin that she and Echavarry had been arguing over financial matters and that Echavarry prevented her from leaving the house. She also told Benjamin that when she tried to make a phone call on her cell phone, Echavarry grabbed the phone away from her and struck her on her neck. Benjamin observed redness on her neck. Benjamin re-entered the house and asked Echavarry if he had his girlfriend's cell phone, and Echavarry removed it from his pocket in response.

Benjamin then arrested Echavarry for assault and battery, abduction, and preventing someone from summoning law enforcement. Pursuant to his arrest, Benjamin searched Echavarry, but discovered nothing of consequence. After the search was complete, Benjamin allowed Echavarry to grab his wallet and house keys from a nightstand table, and had him place the items in his front sweater pocket.

After obtaining warrants for the three charges from the local magistrate, Benjamin took Echavarry to be processed at the local jail. As part of the standard booking procedure, Fauquier Deputy Sheriff John Thomas searched Echavarry and his personal belongings. Thomas discovered one small plastic bag of marijuana and a dime-sized bag containing heroin in Echavarry's wallet. Echavarry was subsequently charged with felony possession of heroin in violation of Code § 18.2-250 and misdemeanor possession of marijuana in violation of Code § 18.2-250.1.

Echavarry made a motion to suppress the admission of the controlled substances, arguing that their discovery would not have occurred but for an unlawful entry of his house, which led to

his initial arrest. The trial court denied the motion, finding that exigent circumstances existed such that the police lawfully needed "to protect the people in the house." This appeal followed.

## II. ANALYSIS

As he did at the trial court below, Echavarry argues on appeal that the police officers' warrantless entry into his house was not justified by a valid exception to the warrant requirement and that the entry led to the eventual discovery of the controlled substances in his wallet when he was processed at the jail. In other words, Echavarry contends that the controlled substances discovered in his wallet at the jail were "fruit of the poisonous tree" of the prior entry into his house. Accordingly, Echavarry concludes that the trial court should have granted the motion to suppress the admission of those substances.

For the purposes of our analysis, we will assume without deciding that the police officers unlawfully entered Echavarry's house. Nevertheless, we cannot conclude that the exclusionary rule should be applied in this case. The connection between the entry into the house and the ultimate discovery of the controlled substances is so attenuated as to dissipate any taint from the entry.[3] In light of the extremely attenuated connection between the entry into the house and the discovery of the controlled substances at the jail, as well as other considerations, we do not believe that suppression would achieve an appreciable deterrent effect sufficient for its justification. Thus, we find no reversible error.

---

[3] Because the trial court ruled that the officer's entry was justified under the exigent circumstances exception to the warrant requirement of the Fourth Amendment, it did not reach the issue of attenuation. However, because we review the issue of attenuation *de novo*, and because "the facts necessary to resolve the issue[] of [attenuation] were established in the record before the trial court," we are not limited by the trial court's failure to address that issue. See Perry v. Commonwealth, 280 Va. 572, 580-81, 701 S.E.2d 431, 436 (2010).

Although we defer to the trial court's factual findings, we review the "application of the 'fruit of the poisonous tree' doctrine [to those facts] *de novo*." United States v. Lentz, 524 F.3d 501, 522 (4th Cir. 2008). "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,'" but it "says nothing about suppressing evidence obtained in violation of this command." Davis v. United States, 131 S. Ct. 2419, 2426 (2011) (quoting U.S. Const. amend. IV). Rather, the United States Supreme Court has adopted a "prudential" rule—the exclusionary rule—designed to enforce the protections of the Fourth Amendment. Id. The Court has repeatedly held that "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." Id. (citing Herring v. United States, 555 U.S. 135, 141 & n.2 (2009); United States v. Leon, 468 U.S. 897, 909, 921 n.22 (1984); Elkins v. United States, 364 U.S. 206, 217 (1960)). Given that purpose, "[a] defendant seeking application of the exclusionary rule faces 'a high obstacle' in demonstrating that exclusion is appropriate." Fitchett v. Commonwealth, 56 Va. App. 741, 746, 697 S.E.2d 28, 31 (2010) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). Accordingly:

> suppression of evidence [is] our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," which sometimes include setting the guilty free and the dangerous at large. [The United States Supreme Court has] therefore been "cautio[us] against expanding" it, and "[has] repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." [The Court has] rejected "[i]ndiscriminate application" of the rule, and [has] held it to be applicable only "where its remedial objectives are thought most efficaciously served,"—that is, "where its deterrence benefits outweigh its 'substantial social costs.'"

Hudson, 547 U.S. at 591 (some alterations in original) (citations omitted). Therefore, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" Davis, 131 S. Ct. at 2426.

- 6 -

Suppression of evidence can yield appreciable deterrence where the illegality engaged in by law enforcement results in the discovery of evidence that naturally flows from that illegality. See, e.g., Wong Sun v. United States, 371 U.S. 471 (1963). Indeed, "evidence obtained as a direct [or indirect] result of an unconstitutional search or seizure is plainly subject to exclusion" as fruit of the poisonous tree. Segura v. United States, 468 U.S. 796, 804 (1984). However, to determine whether particular evidence is "'tainted' or is 'fruit' of a prior illegality" requires us to examine "whether the challenged evidence was 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.'" Id. (alterations and emphasis in original) (quoting Wong Sun, 468 U.S. at 488).

But-for causation is decidedly *not* the test used to determine whether evidence is tainted by an unconstitutional search or seizure such that suppression is an appropriate remedy. Hudson, 547 U.S. at 592; see also Segura, 468 U.S. at 815 (stating that the Supreme Court has "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police'" (quoting Wong Sun, 371 U.S. at 478-88)); Fitchett, 56 Va. App. at 747, 697 S.E.2d at 31. "Rather, but-for cause, or 'causation in the logical sense alone,' can be too attenuated to justify exclusion." Hudson, 547 U.S. at 592 (quoting United States v. Ceccolini, 435 U.S. 268, 274 (1978)). Additionally, the taint of an unlawful search or seizure can dissipate when the causal connection to the purported illegality is remote, id. at 593 (citing Nardone v. United States, 308 U.S. 338 (1939)), when an independent actor's free will breaks the causal chain, see Ceccolini, 435 U.S. at 276-77, 279-80, or "when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained," Hudson, 547 U.S. at 592.

In this case, the connection between the entry and the ultimate discovery of the contraband is simply too attenuated to justify exclusion. The breadth of that attenuation is readily apparent when we examine the causal chain espoused by Echavarry. Essentially, Echavarry argues that the contraband should have been excluded at trial because (1) but for the police officers' entry into his house, the officers would not have spoken with the girlfriend outside; and (2) but for the officers speaking with the girlfriend, they would not have obtained probable cause to arrest Echavarry; and (3) but for Echavarry's warrantless arrest, the officers would not have sought arrest warrants from the magistrate; and (4) but for the existence of warrants, Echavarry would not have been admitted to jail; and (5) but for being admitted to jail, Echavarry would not have been searched for contraband. Thus, to conclude that the discovery of the contraband was a fruit of the poisonous tree of purported police misconduct, we would have to rely upon a lengthy chain of but-for links. It is the very length of this chain that demonstrates the remoteness of the purported illegality from the ultimate discovery of the contraband. As Professor LaFave has emphasized,

> "Where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by 'sophisticated argument,' exclusion would seem inappropriate. In such a case it is highly unlikely that the police officers foresaw the challenged evidence as a probable product of their illegality; thus it could not have been a motivating force behind it. It follows that the threat of exclusion could not possibly operate as a deterrent in that situation."

Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(a) (quoting Comment, Fruit of the Poisonous Tree: A Plea for Relevant Criteria, 115 U. Pa. L. Rev. 1136, 1148-49 (1967)); see also Cecceloni, 435 U.S. at 273-75 (referring to the "road" along which "the train of events" connecting an illegality with the discovery of evidence travels, and holding that the length of the road "is material" in determining whether "'the connection between the

lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint'" (quoting Wong Sun, 371 U.S. at 487, 491)).

Additionally, to exclude the evidence at issue, we would also have to disregard the girlfriend's *volitional* act to walk outside the house and speak with the officers about the domestic disturbance that had occurred. That discussion plainly supplied the officers with probable cause to arrest Echavarry, and there is nothing beyond mere but-for causation tying that conversation to the purportedly unlawful entry. The conversation with the girlfriend did not occur within the house, nor is there any evidence that the officers used their entry to ply details of the disturbance from the girlfriend. As the Supreme Court has previously reflected, "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition." Ceccolini, 435 U.S. at 276. We should not exclude evidence derived from the questioning of a witness when "the time, place and manner of the initial questioning of the witness" suggests that her statements to the officers "were the product . . . of a desire to be cooperative on [her part]." Id. at 277. Nothing here suggests that the girlfriend's conversation with the officers was coerced or not otherwise a product of her free will. Thus, the record illustrates the lack of any significant causal link between the entry and the conversation with the girlfriend.[4]

---

[4] To be sure, Ceccolini held that testimony voluntarily supplied by a witness at trial should not be suppressed even though the witness' statements were to some degree causally related to a prior illegality. Ceccolini, 435 U.S. at 279-80. Nevertheless, we see no material distinction between the legal principle at issue in Ceccolini and the one at issue here. Despite the fact that Ceccolini's holding was confined to the admissibility of the statements themselves, the same principle quite obviously applies to any "fruit" discovered as a result of statements voluntarily made. Such fruit is no longer the product of the prior illegality, but instead it is the product of an intervening cause that is insufficiently related to the prior illegality—namely, the witness' free will. See id. Thus, any fruit discovered as the result of voluntary statements is just as free from the application of the exclusionary rule as the statements themselves.

Finally, there is no suggestion here that the deputy at the jail who discovered the controlled substances in Echavarry's wallet had knowledge of the events leading up to Echavarry's arrest, or that his search of Echavarry was a direct result of the remote entry into the home. Indeed, the deputy's search of Echavarry prior to his admission to the jail strikes us as "'means *sufficiently distinguishable* [to purge] the primary taint'" of the entry into the house. Segura, 468 U.S. at 804 (emphasis in original) (quoting Wong Sun, 468 U.S. at 488). After being taken before the magistrate, Echavarry was arrested on a warrant issued by that judicial officer.[5] Pursuant to Code § 19.2-76, Echavarry was then committed to jail pending trial. The purpose of the deputy's search was not to discover contraband so that he could charge Echavarry with a crime, but to secure the jail and its population and to inventory Echavarry's possessions for safekeeping, a common process that is generally permissible, even as applied to inmates charged with minor offenses. See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 132 S. Ct. 1510 (2012) (holding that a jail could subject a person charged with failure to pay fines to a strip search in order to discover contraband); Illinois v. LaFayette, 462 U.S. 640, 648 (1983) (holding "that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"). Nothing in our jurisprudence suggests that "an arrest in a home without a warrant but with probable cause somehow renders unlawful [the] continued custody of the suspect once he is removed from the house." New York v. Harris, 495 U.S. 14, 18 (1990). Thus, the deputy's discovery of the drugs during a search pursuant to a

---

[5] Neither the arrest warrant nor the officer's affidavit upon which the warrant was based is part of the record before us. However, because judicial officers are presumed to know and follow the law, Crest v. Commonwealth, 40 Va. App. 165, 172 n.3, 578 S.E.2d 88, 91 n.3 (2003), we must assume that the warrant was issued upon a sufficient showing of probable cause.

judicially authorized admission to jail was not "'come at by exploitation of [the prior] illegality'" but was "'instead [come at] by means sufficiently distinguishable to be purged of the primary taint.'"  Hudson, 547 U.S. at 592 (quoting Wong Sun, 371 U.S. at 487-88).

### III.  CONCLUSION

In light of the foregoing reasons, we conclude that "the interest protected by the constitutional guarantee that has been [purportedly] violated would not be served by suppression of the evidence obtained."  Hudson, 547 U.S. at 592.  Echavarry has not overcome the high hurdle to demonstrate otherwise.  Therefore, we affirm the judgment of the trial court denying the motion to suppress.

Affirmed.