COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Decker, AtLee and Senior Judge Frank
Argued by teleconference


COMMONWEALTH OF VIRGINIA

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1603-15-1                      JUDGE RICHARD Y. ATLEE, JR.
                                                         MARCH 11, 2016

JEVON GLENN AUGUSTUS, SR.


             FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                           David W. Lannetti, Judge

           Elizabeth C. Kiernan, Assistant Attorney General (Mark R.
           Herring, Attorney General, on briefs), for appellant.

           London C. Crounse (Andrew Protogyrou; Protogyrou & Rigney,
           PLC, on brief), for appellee.


        This appeal arises from charges brought in the Circuit Court for the City of Norfolk

("trial court") against Jevon Augustus, Sr. for possession of cocaine and obstruction of justice.

Pursuant to Code §§ 19.2-398 and -400, the Commonwealth appeals a pretrial ruling granting in

part Augustus's motion to suppress.  The trial court suppressed all evidence and statements,

except for evidence of Augustus's alleged obstruction of justice.  In so ruling, the trial court

concluded that law enforcement violated Augustus's Fourth Amendment rights in stopping him,

but that the obstruction of justice was a new and distinct crime.  The Commonwealth assigns the

following errors:

        1.  The trial court erred in finding that the police lacked a reasonable, articulable
            suspicion that Augustus had been involved in a drug transaction.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

2.   The trial court erred in finding that the police seized Augustus when they turned on their emergency equipment rather than when Augustus yielded to the police's authority and that Augustus obeyed the signal to stop.

3.   The trial court erred in finding that the evidence of Augustus's traffic infractions was inadmissible and that the police lacked a reasonable, articulable suspicion or probable cause to believe that Augustus had committed a traffic infraction. The court further erred by not finding that the search of Augustus would have been supported by the probable cause for these offenses.

4.   The trial court erred in finding that the police lacked a reasonable, articulable suspicion that Augustus had committed traffic infractions, thereby failing to consider that, under the totality of the circumstances, Augustus's behavior established further cause to investigate Augustus and to justify a drug-dog sweep.

5.   The trial court erred in finding that the drugs and other evidence the police seized from Augustus pursuant to a valid arrest for obstruction of justice was "fruit of the poisonous tree."

6.   The trial court erred in misapplying the so-called "new or distinct crime" doctrine to this case and in finding that, despite Augustus's valid arrest, the evidence the police secured following that arrest was inadmissible.

7.   The trial court erred in suppressing the cocaine and other physical evidence the police seized pursuant to the arrest of Augustus and in suppressing the statements Augustus made following his stop and arrest.

For the following reasons, we affirm.

I. BACKGROUND

On January 4, 2014, two investigators (McCarthy and Allison) from the Norfolk Vice and Narcotics Division were parked in an unmarked police vehicle near the corner of Kincaid Avenue and Aspin Street in the City of Norfolk. At approximately 11:38 p.m., they observed a pick-up truck, driven by Augustus, pull over on the side of the road near an apartment complex. An individual approached the truck, opened the truck's passenger-side door, "leaned into the vehicle for a very brief period of time," shut the door, and "ran back towards where he came from." McCarthy and Allison could not see inside the cabin of the truck and could not determine whether the individual who had approached the truck had anything in his hands before or after reaching into the truck. At no time during the encounter with the individual did McCarthy or

Allison observe Augustus move within the truck cabin or observe the individual and Augustus pass anything between them.

Augustus's truck pulled away from the curb. McCarthy and Allison notified Investigator R.W. Gillespie, who was in another unmarked car in the area, that they had observed a narcotics transaction and requested assistance pulling Augustus's truck over. Gillespie spotted the truck and began following it. McCarthy and Allison's vehicle soon caught up to Gillespie's vehicle. Gillespie activated his emergency equipment to initiate a stop based on the alleged drug transaction, and the other police vehicle followed suit.

The trial court, in a letter opinion, found the following with respect to what took place after law enforcement activated their emergency signals:

> the truck sped up a little, but stayed under the posted speed limit; Augustus at one point appeared to "be almost standing up" behind the wheel; and the truck weaved several times within its lane.[1] Gillespie testified that the truck was "a full one of the really large, like dually-type pickup truck[s]"[2] and that when he observed it, the truck "filled up the entire lane almost." He further testified that: Augustus's actions after the emergency equipment was energized were not "outlandish"; the weaving was the extent of any sort of traffic violation; and his stop was based solely on the alleged drug transaction. Augustus stopped his truck less than two blocks after Gillespie activated his emergency equipment.

Once Augustus pulled over, Gillespie and McCarthy approached the vehicle. Augustus cracked open the truck's driver's side window to pass his driver's license and registration to Gillespie. Gillespie described Augustus as appearing nervous; he was breathing heavily, staring straight ahead to avoid eye contact, and was "a little shaky." McCarthy also stated that Augustus

---

[1] The trial court expressly noted: "Although there was some testimony that the truck touched or crossed the dividing line between opposing lanes of traffic, in light of the totality of the testimony, the Court finds that the truck weaved only within its lane."

[2] The trial court explained: "A 'dually truck' is a truck that has a reinforced rear end with dual rear wheels (*i.e.*, four wheels on the rear axle), making it wider than a comparable truck with only two rear wheels."

seemed nervous, noting that his hands shook and he fidgeted with his phone. Augustus asked if he could close the window because he was cold. At some point, he closed the window and began making phone calls.

At approximately 11:42 p.m., Allison called a K-9 unit to the scene. When it arrived, at approximately 12:05 a.m., Gillespie asked Augustus to exit the truck. Augustus refused. Using the K-9, an officer conducted the narcotics sweep around the exterior of the vehicle, with Augustus still in his truck. The dog subsequently alerted on the truck's driver-side door handle. Again, Augustus was asked to exit the truck, and he refused. He stopped responding and stared straight ahead. Augustus was informed that by not exiting the truck as instructed, he was obstructing justice. The police did not inform Augustus why they pulled him over, nor did they explain his ongoing detention.

Once law enforcement determined that Augustus was not going to exit the truck voluntarily, one investigator then broke the truck's passenger-side window and unlocked the passenger-side door. Law enforcement removed Augustus from the vehicle and placed him in custody. McCarthy searched Augustus's person and felt an object in the groin area. He informed Augustus that he would be taken to the Police Operations Center (the "POC"), where they would retrieve the item. At the POC, the object, which turned out to be cocaine, fell from Augustus's pants during the search.

Augustus was charged with possession of cocaine and obstruction of justice. Augustus filed a motion to suppress, which the trial court granted as to all evidence and statements resulting from the stop and subsequent custodial search except for evidence related to Augustus's alleged obstruction of justice.

## II. STANDARD OF REVIEW

On appeal of an order granting a defendant's motion to suppress, the Commonwealth bears the burden to show that the ruling constituted reversible error. See Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002). Whether a warrantless seizure violated the Fourth Amendment presents a mixed question of law and fact. Jones v. Commonwealth, 279 Va. 521, 527, 690 S.E.2d 95, 99 (2010). Where, as here, the trial court makes express factual findings, we defer to such findings so long as they are supported by credible evidence. Satchell v. Commonwealth, 20 Va. App. 641, 648, 460 S.E.2d 253, 256 (1995). We review *de novo* legal issues such as whether a particular set of facts provided reasonable suspicion or probable cause for a search or seizure. See Brooks v. Commonwealth, 282 Va. 90, 94-95, 712 S.E.2d 464, 466 (2011); Commonwealth v. Benjamin, 28 Va. App. 548, 552-53, 507 S.E.2d 113, 115 (1998).

## III. REASONABLE SUSPICION OF DRUG TRANSACTION

The Commonwealth argues that the time of night, the character of the area, and the observations of trained law enforcement officers together provided reasonable suspicion of a narcotics transaction sufficient to justify a stop. We disagree.

> Under well-settled principles of law, police officers may stop a person for the purpose of investigating possible criminal behavior even though no probable cause exists for an arrest. A stop is permissible so long as the officer has reasonable, articulable suspicion that criminal activity may be afoot. To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or "hunch" that criminal activity is afoot. The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped.

McCain v. Commonwealth, 275 Va. 546, 552, 659 S.E.2d 512, 516 (2008) (citations omitted). Here, investigators observed a truck pull up to a curb, saw an individual approach the

- 5 -

passenger's side, open the door, lean in briefly, shut the door, and then leave. The truck then pulled away. Law enforcement could not see within the passenger compartment, did not see anything change hands, and did not observe any hand-to-hand contact. No one saw the pedestrian carrying anything before or after approaching the truck. The trial court's factual finding that it was not a "high crime" area was supported by the record.[3]

The facts are similar to those in McCain v. Commonwealth, 275 Va. 546, 659 S.E.2d 512 (2008). In McCain, the defendant sought to suppress evidence obtained during a pat-down search. Law enforcement suspected the defendant of drug activity after he went into a house, in which law enforcement had recently conducted a controlled narcotics purchase, in a high crime neighborhood. The defendant went inside the house briefly and returned to the passenger's seat in a vehicle parked outside. The police lawfully stopped the vehicle for a traffic infraction. The Supreme Court held that the trial court erred in failing to suppress evidence found during a pat-down of McCain, stating:

> McCain's brief presence at a house the officer associated with drug activity months prior does not support a reasonable inference of criminal activity. The record does not contain any evidence concerning the purpose of McCain's visit or any suspicious behavior during the visit. A person's Fourth Amendment rights are not lessened simply because he or she happens to live or travel in a "high crime" area.

Id. at 553, 659 S.E.2d at 516. Unlike in McCain, Augustus was not clearly in a "high crime" area. Furthermore, there is no evidence here of drug activity, much less recent drug activity, at the specific apartment complex where Augustus stopped. Otherwise, the facts are quite similar.

---

[3] The testimony that this was a "high crime" area was meager. Allison testified that, over the course of his nine-year career, he had conducted some probable cause buys nearby, helped execute two search warrants in the area, and arrested some people carrying narcotics who were "coming from" that area. He also said a homicide occurred in the area "I believe within the last several months" before the night in question. The trial court found this evidence insufficient to classify the neighborhood as a "high crime" area.

Although the investigators here certainly had some basis for suspecting drug activity, it amounted to no more than an unparticularized suspicion or "hunch." Accordingly, the trial court did not err in finding that the police lacked a reasonable suspicion that the defendant had been involved in a drug transaction.

## IV. REASONABLE SUSPICION ARISING AFTER SIGNAL TO STOP

The Commonwealth argues that, even if the evidence was insufficient to provide reasonable suspicion based upon the drug transaction, reasonable suspicion of either eluding (Code § 46.2-817) or recklessly failing to control the vehicle (Code § 46.2-853) justified the stop.[4] The Commonwealth advocates almost exclusively for eluding, arguing that reasonable suspicion existed because Augustus, after the investigators activated their signals, sped up (even though he did not exceed the speed limit), weaved within the lane, and traveled over one-and-a-half blocks before pulling over. We disagree. Augustus's actions did not provide reasonable suspicion that, after the activation of the emergency signal, he drove "in a willful and wanton disregard of such signal" or "attempt[ed] to escape or elude" as Code § 46.2-817 requires. His behavior could just as, if not more, reasonably be viewed as a startled reaction to the lights and sirens, or an attempt to find a place to pull over. As the Commonwealth notes, "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," Whitaker v. Commonwealth, 279 Va. 268, 275-76, 687 S.E.2d 733, 737 (2010) (alteration in original) (quoting Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000)). None of the investigators had any suspicion, much less a reasonable one, that

---

[4] The Commonwealth also argues that the trial court erred in concluding that Augustus was seized as soon as law enforcement activated their emergency signals, as opposed to when he pulled over. If this was error, Augustus's actions between the signal activation and his pulling over could provide alternative sources of reasonable suspicion or probable cause for the stop. We assume without deciding that Augustus was not seized until he pulled over, because, as we explain here, none of his intervening actions provided reasonable suspicion of criminal activity.

Augustus was eluding, and the trial court found that "Augustus did nothing inconsistent with submitting to the authority of law enforcement."

Although it is a closer question, the Commonwealth also fails to meet its burden to show reasonable suspicion of reckless driving based upon the weaving and the observation that Augustus was "almost standing up" at one point. In most cases, the question of reasonable suspicion based on weaving or unusual behavior arises in the context of suspected impaired driving. See, e.g., Freeman v. Commonwealth, 20 Va. App. 658, 661-62, 460 S.E.2d 261, 262-63 (1995) (reasonable suspicion of impairment when driver drove well below the speed limit, in the center lane on a six-lane highway while cars passed on both sides, and weaved within his lane over the course of a mile). Ongoing weaving within one's lane can provide reasonable suspicion to justify a stop, see Neal v. Commonwealth, 27 Va. App. 233, 239, 498 S.E.2d 422, 425 (1998) (reasonable suspicion of impairment existed when defendant weaved within the lane between five and ten times over a distance of a half-mile), but the mere fact that a driver weaves, even into another lane, does not necessarily render the stop lawful, see King v. Commonwealth, 1995 Va. App. LEXIS 8, at *2 (Jan. 3, 1995) (no reasonable suspicion of driving under the influence where defendant stopped for two seconds at a yield sign despite no oncoming traffic and momentarily drifted across a lane divider).

The investigators here witnessed Augustus weaving, without crossing the lane divider, approximately three times[5] over the course of less than two blocks. The weaving frequency is less than that observed in Neal, but more than in King. Only Neal controls; King is, however,

---

[5] Gillespie testified that Augustus swerved "more than once. It was several times. I just don't remember the exact number. I would say a few times. He just kept swerving maybe three times, two, you know."

- 8 -

persuasive authority.[6]  The observed actions, at least in terms of the amount and duration of weaving, here do not equal, let alone exceed, those in Neal.  That Augustus was positioned unusually in his vehicle does not alter the outcome.  "Lawful conduct that the officer may subjectively view as unusual is insufficient to generate a reasonable suspicion that the individual is involved in criminal activity."  Harris v. Commonwealth, 276 Va. 689, 697, 668 S.E.2d 141, 147 (2008).  Gillespie testified that Augustus's actions after the emergency equipment was energized were not "outlandish," nor was his speed reckless or even unlawful.  He noted that the truck was large and was nearly as wide as the lane.  He also stated that the weaving was the extent of any sort of traffic violation.[7]  The trial court found that there was only an isolated instance of mild weaving within a traffic lane over a very short distance.  These facts, in addition to the significant factual distinctions between this case and Neal and King (neither assessed actions taken *after* law enforcement activated emergency signals, or discussed whether the actions provided reasonable suspicion of reckless failure to control one's vehicle), lead us to conclude that law enforcement did not have reasonable suspicion of reckless driving to justify the stop.[8]

---

[6] "Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority."  Otey v. Commonwealth, 61 Va. App. 346, 351 n.3, 735 S.E.2d 255, 258 n.3 (2012).

[7] Although an officer's subjective assessments of a defendant's behavior are not determinative vis-à-vis reasonable suspicion or probable cause, given the officer's training and experience, such assessments can be relevant.  Cf. United States v. Williams, 945 F. Supp. 2d 665, 671 (E.D. Va. 2013) (noting that "a court must respect the training and expertise of police officers" in their assessments of reasonable, particularized suspicion); United States v. Branch, 537 F.3d 328, 336-37 (4th Cir. 2008) ("[I]t is entirely appropriate for courts to credit 'the practical experience of officers who observe on a daily basis what transpires on the street.'" (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993))).

[8] In light of this holding, we do not reach the Commonwealth's assignment of error considering whether the drug-dog search was constitutional.

V. EXCLUSIONARY RULE APPLICATION

Concluding that law enforcement lacked reasonable suspicion for the stop does not end our analysis, as evidence, even if illegally obtained, will only be suppressed if the exclusionary rule applies. The Commonwealth argues that the trial court erred in suppressing the cocaine and other physical evidence found after Augustus allegedly obstructed justice, because the "new and distinct crime" exception to the exclusionary rule applies.

Generally, "'evidence obtained as a direct [or indirect] result of an unconstitutional search or seizure is plainly subject to exclusion' as fruit of the poisonous tree." Echavarry v. Commonwealth, 60 Va. App. 177, 185, 725 S.E.2d 151, 155 (2012) (alteration in original) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). "The exclusionary rule, created with the intent of deterring police misconduct, 'operates "as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than [to protect] a personal constitutional right of the party accused."'" Brown v. City of Danville, 44 Va. App. 586, 606, 606 S.E.2d 523, 533-34 (2004) (alteration in original) (quoting United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974))).

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

Adams v. Commonwealth, 275 Va. 260, 272, 657 S.E.2d 87, 94 (2008) (quoting United States v. Peltier, 422 U.S. 531, 539 (1975)).

Deterring willful or negligent police misconduct is not the court's only consideration. Determining whether particular evidence is "'tainted' or is 'fruit' of a prior illegality" also

- 10 -

requires a court to examine "whether the challenged evidence was 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.'" Segura v. United States, 468 U.S. 796, 804 (1984) (second alteration in original) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)); see also Echavarry, 60 Va. App. at 185, 725 S.E.2d at 155-56. Under the "new and distinct crime" exception, "if a person engages in new and distinct criminal acts in response to unlawful police conduct, the exclusionary rule does not apply, and evidence of the events constituting the new criminal activity, including testimony describing the defendant's own actions, is admissible." Brown v. City of Danville, 44 Va. App. 586, 600, 606 S.E.2d 523, 530 (2004).

The Commonwealth argues, essentially, that when a defendant commits a crime during the course of an unlawful stop, a court may not suppress any evidence found after the intervening crime. Virginia appellate courts have only applied this exception to the exclusionary rule to allow evidence of the new crime. See, e.g., Foltz v. Commonwealth, 58 Va. App. 107, 117, 708 S.E.2d 914, 919 (2011) (*en banc*) (affirming admission of eyewitness testimony of police officer who witnessed assault), aff'd on other grounds, 284 Va. 467, 732 S.E.2d 4 (2012); Testa v. Commonwealth, 55 Va. App. 275, 285 S.E.2d 2013 (2009) (affirming conviction for obstruction of justice that occurred during allegedly unlawful police entry); Gray v. Commonwealth, 50 Va. App. 513, 516-17, 651 S.E.2d 400, 402 (2007) (affirming conviction for eluding charge "[r]egardless of whether the initial attempted detention was lawful"). We find no support in the existing authority for the Commonwealth's interpretation of the "new and existing crime" doctrine as applied to evidence discovered during a search conducted incident to arrest for an intervening crime, at least as applied to the facts before us.

We are unpersuaded that the two Fourth Circuit cases cited by the Commonwealth support its position: United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997), and United States

v. Gaines, 668 F.3d 170 (4th Cir. 2012). In Sprinkle, the Fourth Circuit denied a motion to suppress and convicted Sprinkle of possession of a firearm as a violent felon, when, after an illegal stop, he pulled out a gun and fired at the police. We recognize that the language in this case used broad language describing the new and distinct crime exception to the exclusionary rule by stating, "Because the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible." Sprinkle, 106 F.3d at 619. In Gaines, however, the Fourth Circuit limited this language and granted a motion to suppress the challenged evidence even though it was seized after the defendant's intervening crime. Specifically, the Court held that the causal chain between the unlawful search and the evidence was unaffected by the suspect's struggle with police because his firearm was discovered beforehand.

We hold that the trial court did not err by applying the exclusionary rule to the challenged evidence given the lack of authority supporting the contention that a "new and distinct crime," much less a non-violent or non-threatening crime, renders *all* evidence discovered during a search incident to the valid arrest admissible. See Brown, 44 Va. App. at 600, 606 S.E.2d at 530 (stating an intervening crime renders "evidence of the events *constituting the new criminal activity*" admissible (emphasis added)); see also Jones v. State, 745 A.2d 856, 872 (Del. 1999) (reversing denial of suppression motion where evidence was seized after the defendant resisted an unlawful arrest, noting that "the crime of resisting an illegal arrest does not necessarily carry with it the right to justify any search incident to an actual arrest for the crime of resisting an illegal arrest"); State v. Beauchesne, 868 A.2d 972, 983-84 (N.H. 2005) (holding that cocaine found during the search incident to arrest should have been suppressed after the police seized the defendant without reasonable suspicion and he resisted arrest).

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's ruling on Augustus's motion to suppress and remand the case for further consideration consistent with this opinion.

<u>Affirmed.</u>